# United States Court of Appeals
## For the First Circuit

---

No. 03-1141

JORGE J. MAYMÓ-MELÉNDEZ,

Plaintiff, Appellee,

v.

JULIO ÁLVAREZ-RAMÍREZ, ET AL.,

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Torruella and Lynch, Circuit Judges.

---

Ivette M. Berríos-Hernández with whom Eduardo A. Vera-Ramírez and Landrón & Vera, L.L.P. were on brief for appellants.
Charles A. Cuprill-Hernández with whom Charles A. Cuprill, P.S.C. Law Offices was on brief for appellee.

---

April 12, 2004

---

**BOUDIN, Chief Judge.** This appeal concerns efforts by the Puerto Rico Horse Racing Industry and Sport Administration (the "Administration") to suspend the horse training license of Jorge Maymó-Meléndez ("Maymó") for improperly administering drugs to certain race horses under his care. The district court granted a preliminary injunction preventing Maymó's suspension and the appellants now seek reversal of that order.

Pursuant to the Puerto Rico Horse Racing Industry and Sport Act, 15 L.P.R.A. §§ 198-198s (2000), the Administration was "created as a public instrumentality to regulate everything connected with the horse racing sport in the Commonwealth of Puerto Rico." Id. § 198a. The Administration is comprised of a Racing Board, which is made up of three members, and a Racing Administrator; the members of the Racing Board and the Racing Administrator are appointed by the Governor of Puerto Rico. Id. §§ 198c(a), 198j(a).

The Racing Board is "empowered to regulate everything connected with the Horse Racing Sport," 15 L.P.R.A. § 198e(a), including "[t]o prescribe, by regulations, the fines, administrative penalties and suspensions that can be imposed by the [Racing] Board, the Horse Racing Administrator, . . . or other authorized officials." Id. § 198e(b)(8). The Racing Administrator is the Administration's principal executive officer, id. § 198k(a), and has the power to "[e]nforce compliance [with] the racing laws

-2-

and regulations and the orders and resolutions of the Horse Racing Board," id. § 198k(a)(1), and to "[g]rant, suspend temporarily, or permanently cancel the licenses of horse . . . trainers" after notice and hearing.  Id. § 198k(a)(2).

In 1996, the Racing Board promulgated the "controlled medication program," a set of regulations that governs the administration of drugs to race horses.  The controlled medication program prohibits some drugs outright; others are allowed, but only if administered in accordance with established procedures by authorized personnel.  Two of the drugs regulated (but not prohibited) by the medication program are Clenbuterol, given to horses with respiratory problems, and Tramadol, which is an analgesic.

Between June 10, 1999, and June 21, 1999, nine horses that had been trained by Maymó underwent post-race urine tests that came back positive for Clenbuterol––one horse tested positive twice, thus making a total of ten positive tests.  By August 17, 1999, then Racing Administrator Juan Alves Rueda ("Alves") had filed ten corresponding charges against Maymó, alleging that Clenbuterol had been administered in violation of the controlled medication program.  Alves consolidated the charges (the "Clenbuterol case"), assigned Irba Cruz de Batista ("Cruz"), an independent contractor for the Administration, to act as hearing examiner, and ordered Ricardo Pacheco Pacheco ("Pacheco"), an

attorney employed by the Administration, to act as prosecutor. 15 L.P.R.A. § 198k(a)(9).

Hearings in the Clenbuterol case were held before Cruz from August to October 2000. In the midst of these proceedings, on September 29, 2000, a horse trained by Maymó underwent a post-race urine test that came back positive for Tramadol. On October 16, 2000, Cruz submitted a report to Alves, concluding that, in all ten instances, Maymó had administered the Clenbuterol in violation of the controlled medication program. Maymó filed objections to Cruz's report, but on November 3, 2000, Alves adopted the report, accepting its findings of fact and conclusions of law. Alves suspended Maymó's license to train horses for five years and imposed a $2,750 fine.

Maymó filed a petition for review of Alves's decision with the Racing Board, 15 L.P.R.A. § 198m, and moved for a stay of the license suspension and fine pending review. While Maymó's petition and motion were pending before the Racing Board, Alves filed a new charge against Maymó based on the positive Tramadol test (the "Tramadol case"); Alves again assigned Cruz as hearing examiner and Pacheco as prosecutor. The Racing Board ultimately granted Maymó's requested stay in the Clenbuterol case, and later Maymó's license was renewed for the following year. Id. § 198o(b).

On April 9, 2001, the Racing Board, by divided vote, sustained Alves's decision in the Clenbuterol case, affirming the

five-year suspension of Maymó's license and the $2,750 fine. Pursuant to 15 L.P.R.A. § 198n(a), Maymó sought review of the Racing Board's decision in Puerto Rico's Circuit Court of Appeals. That court granted Maymó a stay of the penalties that had been imposed upon him pending resolution of his appeal.

In June 2001, Julio Álvarez Ramírez ("Álvarez") succeeded Alves as Racing Administrator. Hearings in the Tramadol case were held before Cruz from January to May 2002. On June 10, 2002, Cruz sent a report to Álvarez, concluding that Maymó had violated the controlled medication program by improperly administering Tramadol to the horse in question.

On June 21, 2002, the Puerto Rico Circuit Court of Appeals affirmed the Racing Board's decision in the Clenbuterol case. However, Álvarez took no immediate action to impose the license suspension and the fine, there being some uncertainty as to whether the court's stay continued in effect until its mandate issued. On June 26, 2002, Álvarez adopted Cruz's findings of fact and conclusions of law in the Tramadol case. Álvarez directed that Maymó's license be suspended for five years to run consecutively to the pending suspension in the Clenbuterol case and imposed a $1,000 fine.[1]

---

[1]Álvarez also referred Maymó to the Racing Board, asking that it declare Maymó a "racing nuisance," a statutory brand that, if imposed, would have subjected Maymó to criminal penalties (including up to ten years in prison) for even attempting to enter a "racetrack or dependency thereof." 15 L.P.R.A. § 198e(b)(7).

On June 27, 2002, with the suspension of his license from the Tramadol case set to begin on July 1, 2002, Maymó filed suit under 42 U.S.C. § 1983 (2000) in federal district court in Puerto Rico against Álvarez, Pacheco, and Cruz. The suit, directed solely to the suspension in the Tramadol case because the Clenbuterol case remained in limbo in the state court, alleged due process violations: that the controlled medication program was unconstitutionally vague and arbitrary and that the named defendants were unfairly biased against Maymó. The suit sought damages and to enjoin the Racing Administrator from suspending Maymó's license.

On July 3, 2002, notwithstanding the federal lawsuit, Maymó petitioned the Racing Board for review of Álvarez's June 26, 2002, decision, adopting Cruz's findings of fact and conclusions of law in the Tramadol case. 15 L.P.R.A. § 198m. On the same day, the federal district court held a hearing on Maymó's request for interim relief relating to the Tramadol suspension. At the hearing, Álvarez made clear that he intended to suspend Maymó's license based on the Clenbuterol case when the state-court stay expired. With respect to the Tramadol case, the district court ultimately entered a temporary restraining order pending resolution of the request for a preliminary injunction.

On July 11, 2002, Maymó having failed to obtain an extension of the state-court stay, Álvarez suspended Maymó's

-6-

license based on the Clenbuterol decision.[2]  That same day, Álvarez returned to Maymó his petition for the Racing Board to review the Tramadol decision, saying that review was pointless in light of the ongoing litigation in federal court.  On July 14, 2002, Maymó filed a second federal action, similar to the first (except for the addition of Alves as a defendant), to enjoin suspension based on either the Clenbuterol or the Tramadol case; the district court consolidated the two federal cases and issued a second temporary restraining order.

From September 30, 2002, to October 4, 2002, the district court conducted a hearing on whether to issue a preliminary injunction barring the Racing Administrator from suspending Maymó's license.  On the first day of this hearing, the defendants filed a motion to dismiss, arguing inter alia that the district court should refrain from deciding the consolidated cases based on the principles of abstention outlined in Younger v. Harris, 401 U.S. 37 (1971), and that the defendants were covered by quasi-judicial or qualified immunity.

On November 26, 2002, the district court issued an opinion and order holding the following: that the individual defendants were entitled to qualified immunity and immune from

---

[2]On August 7, 2002, the Puerto Rico Circuit Court of Appeals denied Maymó's motion for reconsideration of its decision affirming the Racing Board in the Clenbuterol case.  Maymó sought review in the Supreme Court of Puerto Rico.  On October 25, 2002, the Supreme Court of Puerto Rico denied Maymó's petition for further review.

money damages; that abstention under <u>Younger</u> was not appropriate; and that Maymó was entitled to a preliminary injunction preventing the defendants from suspending his license and collecting the fines that had been levied against him. The defendants now appeal, arguing that <u>Younger</u> abstention was required and, alternatively, that Maymó failed to establish the prerequisites for a preliminary injunction.

<u>Younger</u> is a court-made rule of abstention built around the principle that, with limited exceptions, federal courts should refrain from issuing injunctions that interfere with ongoing state-court litigation, or, in some cases, with state administrative proceedings. <u>See generally</u> <u>Younger</u>, 401 U.S. at 43-45, 53-54. This core principle leaves open a host of peripheral questions to which the precedents provide only half answers or decisions in tension with one another. <u>See</u> Chemerinsky, <u>Federal Jurisdiction</u> § 13.3 (3d ed. 1999); 17A Wright, Miller & Cooper, <u>Federal Practice and Procedure</u> § 4251, at 180-81, 191-93 (2d ed. 1988). This case poses several of those problems.

Although initially applied to protect state criminal prosecutions against interference, the <u>Younger</u> doctrine has been extended to "coercive" civil cases involving the state and to comparable state administrative proceedings that are quasi-judicial

-8-

in character and implicate important state interests.[3]    In regulating thoroughbred racing, the Commonwealth aims to ensure the integrity of the sport and to protect legitimate state interests. The proceedings within the Racing Board to cancel licenses after notice and hearing fit within the category of matters potentially subject to Younger.  See Baffert v. Cal. Horse Racing Bd., 332 F.3d 613, 616-21 (9th Cir. 2003) (applying Younger).

The district court said that Younger abstention did not apply because neither the Clenbuterol nor the Tramadol matters were "ongoing" at the time the principal injunction was granted on November 26, 2002.  By that time the state-court proceedings affirming the sanction in the Clenbuterol case were effectively completed with the affirmance of the Racing Board's action; and in the Tramadol case, the Racing Administrator had imposed penalties and had returned Maymó's review petition so no proceedings were pending before the Racing Board.

Although the Clenbuterol case had been decided by the state appeals court when Maymó filed his second federal complaint-- the time at which the Younger test is applied, Bettencourt v. Bd.

_____

[3]See Huffman v. Pursue, Ltd., 420 U.S. 592, 603-05 (1975) (applying Younger to a civil proceeding initiated by the state to enforce a nuisance statute); Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc., 477 U.S. 619, 623-27 (1986) (applying Younger to state administrative proceedings based on alleged sex discrimination); Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 435 (1982) (applying Younger to administrative proceedings brought by state ethics committee to discipline an attorney).

of Registration in Med., 904 F.2d 772, 777 (1st Cir. 1990)--the state case was still technically ongoing because Maymó had filed a petition for reconsideration. Yet it would be a waste of time to reverse based on this technicality,[4] and, as it turns out, the injunction against the Clenbuterol order is barred on other grounds to which we will shortly turn.

Although Younger is ordinarily described as applying where the state case or proceeding is "ongoing," a moment's reflection suggests that this cannot be the whole story. There is some sense to a mechanical rule that Younger does not apply where the state litigation has not yet begun; after all, the underlying concern is that state proceedings, once begun, should be respected by federal courts so long as the federal claims or defenses can be litigated in the course of the proceedings. See Younger, 401 U.S. at 44-45, 53-54; cf. Brooks v. N.H. Supreme Court, 80 F.3d 633, 638 (1st Cir. 1996).

However, it makes little sense to ignore Younger's policy simply because the state process has come to an end. After all, how does it "respect" state proceedings to wait until they are concluded and then ignore or overturn them? And yet the case law is something of a vacuum on this question, partly because of the variousness of the situations but mostly because other rubrics

---

[4]Because a dismissal on Younger grounds is without prejudice, see Caldwell v. Camp, 594 F.2d 705, 708 (8th Cir. 1979), Maymó would presumably be free in this case to re-file the complaint immediately (state court review having now undoubtedly concluded).

-10-

usually foreclose the collateral attack after the state proceedings have ended, making unnecessary any discussion of Younger.

Three such rubrics have special force where, as with the Clenbuterol proceedings, state-court judicial review of an administrative ruling has been undertaken and completed: res judicata, the federal full faith and credit statute, and the Rooker-Feldman doctrine.[5]  Although nominally independent doctrines, they are variations on the same theme: the first embodies a bedrock respect for prior judgments, subject to exceptions; the second, a statutory compulsion for the first where federal courts confront state judgments; and the third, a broader and blunter version of the other two.

Often the first resort of federal judges is to the Rooker-Feldman doctrine--and peculiarly so in case of disbarment, revocations of licenses, and the like.  See 18B Wright, Miller & Cooper, supra, § 4469.1, at 120.  Merger and bar doctrine is often hard to adapt to claims not cast in the traditional common law mode; and collateral estoppel requires the precise identification of issues actually litigated and decided in the first case and sought to be re-litigated in the second.  Restatement (Second) of

---

[5]Res judicata is familiar common law doctrine, see Restatement (Second) of Judgments §§ 17-20, 24, 27 (1982); the federal statute is 28 U.S.C. § 1738 (2000); and Rooker-Feldman refers to Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983).  It is no accident that the doctrines are discussed together in 18B Wright, Miller & Cooper, supra, §§ 4469-4469.1.

Judgments § 27 & cmt. c-o (1982). So, despite the disapproval of scholars, federal courts regularly use Rooker-Feldman to rebuff collateral attacks on prior state court judgments without purporting to apply the technical preclusion rules of res judicata.[6]

One obvious reason is that when a state judicial proceeding does occur, federal judges usually say that the parties ought to raise all of their claims, defenses and objections. If the parties do, and are permitted to litigate the issues, the judges think that should ordinarily settle the matter, subject to certiorari review in the Supreme Court; and if they don't, they should not later come and complain to the federal courts. There are pluses and minuses to this approach but, with some exceptions, it has carried the day so far, and it does so here as to the Clenbuterol case.

In that case, the Racing Administrator and the Racing Board may have been biased, unfair, or flat out wrong; but the state provided a judicial remedy, Maymó invoked it, and he lost. Maymó conceded at oral argument that he had argued to the state court in the Clenbuterol case both that the medication program was constitutionally flawed and that bias infected the administrative

---

[6]The catalogue of federal cases doing so, and the scholarly disapproval, are both reflected in 18B Wright, Miller & Cooper, supra, § 4469.1. For a thick law review volume devoted to (thus far ineffectual) scholarly criticism of Rooker-Feldman, see Symposium: The Rooker-Feldman Doctrine, 74 Notre Dame L. Rev. 1081, 1081 (1999).

proceeding.  Although he disputes that he had a full and fair opportunity to litigate these issues, we address this claim below and find that it is unpersuasive.

To enjoin enforcement of the Racing Board's sanction, after its affirmance by the state court, amounts to a collateral attack on a state court judgment.  See, e.g., Wang v. N.H. Bd. of Registration in Med., 55 F.3d 698, 703 (1st Cir. 1995).  Rooker-Feldman does not depend on what issues were actually litigated in the state court; and it is enough that granting Maymó the injunction he seeks would effectively overturn the state court's decision.  The case law to this effect is extensive.  E.g., Mandel v. Town of Orleans, 326 F.3d 267, 271 (1st Cir. 2003); Hill v. Town of Conway, 193 F.3d 33, 39-40 (1st Cir. 1999).[7]

There are exceptions to Rooker-Feldman, see 18B Wright, Miller & Cooper, supra, § 4469.1, at 127-37, and the one that comes closest derives from cases saying that a general attack on a state law or regulation is not precluded by a prior judgment applying such a law or rule to the federal plaintiff.  Id. at 123; Wilson v. Shumway, 264 F.3d 120, 124 (1st Cir. 2001).  The exception does not apply, however, if the relief sought in federal court is directed towards undoing the prior state judgment.  See Kenmen Eng'g v. City of Union, 314 F.3d 468, 476 (10th Cir. 2002) ("In conducting

---

[7]The Rooker-Feldman doctrine was not raised as an objection on this appeal, but it is jurisdictional, Mandel, 326 F.3d at 271, and cannot be ignored.  Friedman's, Inc. v. Dunlap, 290 F.3d 191, 195-96 (4th Cir. 2002).

[Rooker-Feldman] analysis, we must pay close attention to the relief sought by the federal-court plaintiff." (emphasis in original)).

Here, one facet of Maymó's due process claim was a general attack on the Racing Board's drug regulations; he argued that they were unconstitutionally vague and contradictory and the district court agreed. But, so far as advanced as a reason to grant an injunction overturning his license suspension, Maymó's challenge is an attack on the Puerto Rico Circuit Court of Appeals's decision affirming the suspension and is therefore barred by Rooker-Feldman. See Wilson, 264 F.3d at 125; Hill, 193 F.3d at 39-40. Had he been suspended for a week and then sought to enjoin future enforcement of the regulations, that would be a different question. See Hood v. Keller, 341 F.3d 593, 597-99 (6th Cir. 2003).

Maymó's assault on the Tramadol suspension presents a different problem. As to it, there was no state-court proceeding; indeed, Maymó was only to the stage of appealing the Racing Administrator's decision to the Racing Board when he brought his initial federal action to enjoin the suspension. Rooker-Feldman is based on the Supreme Court's reading of a statute governing review of state-court judgments, Feldman, 460 U.S. at 476 (relying on 28 U.S.C. § 1257 (2000)); Rooker-Feldman does not insulate from federal challenge administrative rulings standing alone. Van

-14-

Harken v. City of Chicago, 103 F.3d 1346, 1349 (7th Cir. 1997); 18B Wright, Miller & Cooper, supra, § 4469.1, at 143-44.

However, Younger (as already noted) does apply to administrative proceedings like this one. Thus, we confront the district court's conclusion that Younger did not apply in this case because the administrative proceedings in the Tramadol case were not ongoing when the first federal action to enjoin the Administrator's order was filed. True, thereafter Maymó sought review by the Racing Board but, as the review petition was then returned (because of the pending federal action), we will accept arguendo the district court's premise that the federal action came after the conclusion of any pending administrative proceedings.

The question, then, is whether Maymó can avoid Younger abstention by failing to pursue his administrative remedy within the Racing Board. This question, although not identical, is related to the larger question whether, even if Maymó had completed review by the Racing Board, he could have refused to seek judicial review in the state court and instead brought his federal claims to federal court in an injunction action. Needless to say, this issue--essentially an exhaustion of remedies question--is a matter of general importance that could affect an array of state proceedings.

To us, the answer is dictated by Huffman v. Pursue, Ltd., 420 U.S. 592 (1975), and its progeny. In Huffman, the Supreme

Court said that once a state judicial proceeding had begun, the exhaustion of state judicial remedies was required by Younger; despite the formal break between trial and appellate review, the Court deemed the proceeding "ongoing" for Younger purposes until the state appellate process was complete. Id. at 607-11. This was so even though the state court decision would then likely be preclusive of any new federal lawsuit.

At the time Huffman was decided, Younger had not formally been extended to state administrative proceedings; and the Court reserved the exhaustion question as to them.[8] But the Supreme Court thereafter extended Younger to such proceedings in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982), and Ohio Civil Rights Commission v. Dayton Christian Schools, Inc., 477 U.S. 619 (1986), its premise being that the administrative proceedings were subject to Younger because they were "judicial" in character. 457 U.S. at 432-34; 477 U.S. at 627-28. In Dayton, the Court further stressed that if the constitutional mistakes were not remedied at the administrative level, state courts would be available to set the matter right. 477 U.S. at 629.

Given such rhetoric and the policy judgments underlying the recent decisions, Younger now has to be read as treating the

---

[8]It purported to reserve this issue, citing two ancient Supreme Court cases that allowed federal equity suits to challenge state administrative action. Huffman, 420 U.S. at 609 n.21.

-16-

state process--where the administrative proceeding is judicial in character--as a continuum from start to finish. There are exceptions to Younger (to which we will return) but, absent an applicable exception, there cannot at any point on the continuum be an automatic right to detour into federal court because unhappy with an initial answer.

The principal author of these "Younger-extended" opinions has been Chief Justice Rehnquist. When, following Dayton, he summed up in a concurrence in New Orleans Public Service, Inc. (NOPSI) v. Council of New Orleans, 491 U.S. 350 (1989), he specifically described the Younger rule as one that treats a matter as "ongoing" from the administrative proceeding into the state judicial proceeding:

> Nothing in the Court's opinion curtails our prior application of Younger to certain administrative proceedings which are 'judicial in nature[';] nor does it alter our prior case law indicating that such proceedings should be regarded as 'ongoing' for the purposes of Younger abstention until state appellate review is completed. (citations omitted) (emphasis in original).

This conclusion does little more than spell out what is inherent in Huffman, Middlesex, and Dayton, taken together; and it is certainly the view taken by three out of four circuits that have addressed the exhaustion question.[9] The majority view--

---

[9]Compare Thomas v. Tex. State Bd. of Med. Exam'rs, 807 F.2d 453, 455-57 (5th Cir. 1987) (holding that exhaustion of opportunities to appeal in state court from adverse administrative decision is not required by Younger), with Majors v. Engelbrecht,

reflected in <u>O'Neill</u> v. <u>City of Philadelphia</u>, 32 F.3d 785 (3d Cir. 1994)--is persuasive to us:

> We have been given no reason why a litigant in a state administrative proceeding should be permitted to forego state-court review of the agency's decision in order to apply for relief in federal court. Rather, we find the grounds offered by the Supreme Court to support its holding in <u>Huffman</u>--that state appellate review of a state court judgment must be exhausted before federal court intervention is permitted--are equally persuasive when considered with respect to state-court judicial review of a state administrative decision.

<u>Id.</u> at 790-91. The opinion continues by quoting portions of <u>Huffman</u> and other decisions that reinforce this view. <u>Id.</u> at 791.

<u>Huffman</u> is a reliable guide only where full-fledged state administrative proceedings of a judicial character and, arguably, of a coercive nature, are directed against the federal plaintiff. <u>See</u> <u>Alleghany Corp.</u> v. <u>Haase</u>, 896 F.2d 1046, 1050-53 (7th Cir. 1990). If Maymó had been summarily suspended by the Racing Administrator and no administrative proceeding had been begun, he could have gone directly to federal court to challenge his dismissal. <u>See</u> <u>Patsy</u> v. <u>Bd. of Regents</u>, 457 U.S. 496, 498, 516 (1982); <u>Barry</u> v. <u>Barchi</u>, 443 U.S. 55, 59-61, 63 n.10 (1979); <u>see also</u> <u>Dayton Christian Schs., Inc.</u>, 477 U.S. at 627 n.2. Admittedly, a line between summary action and full-fledged

---

149 F.3d 709, 712-13 & n. 3 (7th Cir. 1998) (holding the opposite), <u>O'Neill</u> v. <u>City of Philadelphia</u>, 32 F.3d 785, 790-91 & n.13 (3d Cir. 1994) (same), <u>and</u> <u>Alleghany Corp.</u> v. <u>McCartney</u>, 896 F.2d 1138, 1143-45 (8th Cir. 1990) (same).

administrative proceedings that are judicial in nature is bound to be fuzzy.

In <u>Kercado-Melendez</u> v. <u>Aponte-Roque</u>, 829 F.2d 255 (1st Cir. 1987), a school superintendent (Kercado) in Puerto Rico was terminated after an informal hearing at which she was given a chance to respond to allegations of "incompetence, negligence, insubordination, and improper conduct." <u>Id.</u> at 257-58. The termination order specified that it would take effect ten days after receipt, unless Kercado chose to file an administrative appeal to the Board of Appeals of the Public Education System. <u>Id.</u> Instead, Kercado filed a federal suit, alleging retaliation for activities protected by the First Amendment. <u>Id.</u>

The panel majority held that <u>Younger</u> did not apply because Puerto Rico did not require any kind of formal procedure <u>prior</u> to the issuing of a termination order and because all post-order proceedings were within the discretion of the aggrieved party and were not necessary to the order's taking effect. <u>Kercado-Melendez</u>, 829 F.2d at 260-62.[10] <u>Kercado-Melendez</u> does Maymó no good, however, because he was suspended only after full-fledged administrative proceedings. There is a spectrum stretching from

_____

[10]Judge (now Justice) Breyer dissented, arguing that the termination was not truly complete until after the formal review process--he deemed the termination order merely the beginning of an integrated proceeding--and he thought that in any event <u>Huffman</u> still applied. <u>Id.</u> at 267-68 (Breyer, J., dissenting).

-19-

Huffman to Patsy and Kercado-Melendez may be in the middle; but Maymó's situation is clearly at the Huffman end.

Younger, even where it presumptively applies, is not implicated where the federal claims cannot be raised and resolved somewhere in the state process. Middlesex County Ethics Comm., 457 U.S. at 432. How far the Racing Board would entertain constitutional objections to its regulations or practices is unclear, but the state court clearly would do so and this is enough. As noted above, in Dayton the Supreme Court said "it is sufficient . . . that constitutional claims may be raised in state-court judicial review of the administrative proceeding." 477 U.S. at 629.

Maymó says that one claim in particular--that Alves harbored bias against him--could not be developed because, in the administrative proceeding involving Clenbuterol, he was not allowed to subpoena Alves to develop that claim and so was limited by a truncated record on appeal. Denial of an opportunity to develop a material issue is a standard basis for overturning an adverse administrative decision, Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985), and Maymó has not persuasively explained why this remedy was inadequate in this case.[11]

---

[11]At oral argument, Maymó said (without citation) that the state court had no power to remand to the Racing Board to develop more evidence. But it would take more than general assertion to persuade us that a competent state court with authority to review a disciplinary order lacked other remedies (e.g., setting aside the order) where a material issue had been wrongly foreclosed.

Taking a related but somewhat different tack, Maymó argues that an exception to Younger permitted him to go to federal court directly to forestall an administrative action against him conducted by a biased tribunal. In substance, Maymó says that Alves, Cruz, Pacheco, and Álvarez were prejudiced against him and, in addition, that he was singled out for discipline while other trainers similarly situated were not pursued. These facts, he says, he was entitled to develop in an independent action in federal court. His main reliance is upon Gibson v. Berryhill, 411 U.S. 564 (1973).

In Gibson, a group of optometrists sued in federal court to enjoin disciplinary proceedings against them by a state board, 411 U.S. at 568-70; and the Supreme Court said that Younger did not bar a due process claim that the administrative tribunal was "incompetent by reason of bias [an alleged financial stake in the outcome] to adjudicate the issues pending before it." Id. at 577-79. The Court also said: "[n]or, in these circumstances, would a different result be required simply because judicial review, de novo or otherwise, would be forthcoming at the conclusion of the administrative proceeding." Id. at 577.

Gibson was decided only two years after Younger began the process of contracting federal-court remedies, but it has never been formally overruled. Further, in Huffman itself, the Supreme Court said that "of course" exceptions to Younger's bar remained,

-21-

mentioning not bias but state proceedings brought "to harass," or "in bad faith," or to enforce a flagrantly unconstitutional statute. 420 U.S. at 611-12. The opinion added, however, that irreparable injury would still be required for an injunction based on such an exception. Id. at 612.

The scope and conditions of the various Younger exceptions remain uncertain. Underneath the surface is an unspoken policy debate as to how much should be done by federal courts and how far state courts are to be trusted; the Chief Justice's majority opinion in Huffman plays out this debate in a counterpoint with the dissent, joined by three Warren Court veterans. Compare 420 U.S. at 608-11 (Rehnquist, J.), with id. at 616-18 (Brennan, J., dissenting). About all that is certain is that there is some reason for interim federal court intervention where core constitutional values are threatened during an ongoing state proceeding and there is a showing of irreparable harm that is both "great and immediate." See Younger, 401 U.S. at 46.

In all events, this case--given its present posture-- cannot fall within any rational Younger exception. Because the first five year suspension (based on the Clenbuterol order) has now been immunized from district-court review on grounds independent of Younger, only the second (Tramadol) suspension remains; and it has no bite for five years. This makes it impossible to show an

immediate threat to Maymó's constitutional rights that would justify an injunction by-passing existing state remedies.

So far as the Younger exceptions are concerned with the impact of the state proceeding independent of any final remedy (e.g., to harass), the suspension order has already been entered; so far as the concern is with implementing an order before state review is completed (e.g., the initial injunction against the theater in Huffman), Maymó now has five years to complete his administrative and judicial review options. Nor is there any "flagrantly" unconstitutional statute or regulation. Compare Huffman, 420 U.S. at 611-13.

This case is not one in which a denial of relief is a comfortable outcome. Maymó offered more than trivial evidence that the medical regime used by the Racing Board is incomplete and was unfairly implemented; the district court thought that the evidence (on a preliminary look) was persuasive. The district court also saw force in Maymó's claims of bias or selective enforcement, although to us this is less clear-cut. Maymó's suit is by no means "totally unfounded, frivolous, or otherwise unreasonable"--the test for awarding fees against the plaintiff who fails in a section 1983 action. Casa Marie Hogar Geriatrico, Inc. v. Rivera-Santos, 38 F.3d 615, 618 (1st Cir. 1994).

Yet so long as the Administrator is prepared to reinstate Maymó's temporarily dismissed Tramadol appeal, it is not apparent

why Younger's policy bar should be ignored and state processes by-passed.[12]  Conceivably, the district court's findings, which have at least persuasive force, may give Maymó some basis for asking the Racing Board or the state courts in the Clenbuterol case to re-open that matter as well--steps that might vindicate the faith Huffman and Dayton now place in state proceedings.

The district court's injunctive orders are vacated and the matter remanded to the district court for proceedings consistent with this opinion.  Each side will bear its own costs on this appeal.

It is so ordered.

---

[12]Maymó did not fail to seek administrative review; he did file a request, which the Administrator returned because of the pending federal court action.  If the Administrator now failed to reinstate the review proceeding, there would be a serious question whether state procedures were adequate to protect Maymó's constitutional rights.