**Janeen MILLER; James Mahood, Plaintiffs, Appellants,**

v.

**Kristen NICHOLS; Brenda Harvey, in her capacity as Commissioner of the Maine Department of Health and Human Services, Defendants, Appellees.**

No. 09–1174.

United States Court of Appeals, First Circuit.

Heard Oct. 6, 2009.

Decided Nov. 4, 2009.

Eric H. Mehnert with whom Hawkes & Mehnert, LLP, were on brief for appellant.

Melissa Reynolds O'Dea, Assistant Attorney General, with whom Janet T. Mills, Attorney General of Maine, and Paul Stern, Deputy Attorney General, were on brief for the appellees.

Before LYNCH, Chief Judge, TORRUELLA and BOUDIN, Circuit Judges.

LYNCH, Chief Judge.

Plaintiffs are the parents of a child removed from them by the state after extensive proceedings resulted in a finding that the best interests of the child required termination of their parental rights. *In re G.M.*, No. PC–05–75 (Me.D.Ct. Jan. 23, 2008). The parents then sued in federal court, asserting violations of statutory and constitutional rights during the termination proceedings and particularly in reunification efforts mandated by state law. They sought injunctive relief to prevent a foster family's adoption of the child, as well as monetary damages.

Plaintiffs appeal from a district court order dismissing their suit for lack of jurisdiction and on the basis of issue preclusion. Because the injunction sought would negate the state court's judgment and because the factual issues underpinning plaintiffs' present claims for damages were addressed by the state court, the district court's dismissal on *Rooker–Feldman* and on issue preclusion grounds was appropriate. We affirm.

I.

We take the facts largely as described by the district court and drawn from the record of the state court proceedings. There are no facts in dispute that are material to the motion to dismiss. All facts recited are a matter of public record.

On December 25, 2005, plaintiffs Janeen Miller and James Mahood brought their biological infant daughter, G.M., to the emergency room of Mercy Hospital in Portland, Maine, reporting that she had experienced a seizure. Fearing they were unable to treat G.M., the medical staff transferred the twenty-two-month-old to Maine Medical Center that night. Upon her arrival, doctors promptly diagnosed G.M. with severe failure to thrive, a diagnosis applied to infants whose physical development lags "far below usual levels for age." *Stedman's Medical Dictionary* 627 (26th ed. 1995). Despite the doctors' serious concerns about G.M.'s condition, Miller and Mahood objected to the performance of various medical tests, some of which were time sensitive, and insisted that G.M.'s symptoms were caused by a flu shot she had received that fall. After Miller and Mahood continued to resist efforts to treat G.M. for two days and gave vague and inconsistent answers about G.M.'s feeding patterns, medical staff became concerned for G.M.'s welfare while in her parents' care. The treating physician relayed her concerns to the Maine Department of Health and Human Services ("DHHS").

On December 27, 2005 DHHS obtained an Order of Preliminary Child Protection, placing the child in DHHS's temporary custody. Doctors expanded their diagnosis of G.M.'s condition to include "acute potentially life-threatening metabolic acidosis; temporary hypothyroidism; Vitamin D deficient rickets; profound de-

velopmental delays; and inadequate immunizations."

On May 8, 2006, a state district court judge entered a Jeopardy Order, placing G.M. in the full custody of DHHS. In addition to recounting G.M.'s medical issues, the order identified the jeopardy presented to G.M. by each of her parents. The court particularly noted Miller's "mental health issues," including a potential psychotic disorder, as well as Mahood's "tendency to be passive in his relationship with [Miller]," a trait that the state court determined adversely impacted "[Mahood's] protective judgment." The parents agreed to the entry of the Jeopardy Order.

The issuance of the Jeopardy Order also required DHHS to engage in statutorily mandated efforts to reunify G.M. with her parents. Under Maine law, if a Jeopardy Order removes a child from parental custody and grants custody to DHHS, DHHS must play an active role in efforts to rehabilitate and reunify the family. *See* 22 M.R.S.A. § 4041(1–A)(A); *see also In re Christmas C.*, 721 A.2d 629, 630 (Me.1998). Maine law also places responsibilities on the child's parents, including "[r]ectify[ing] and resolv[ing] problems that prevent the return of the child to the home" and "[t]ak[ing] part in a reasonable rehabilitation and reunification plan." 22 M.R.S.A. § 4041(1–A)(B); *see also In re Christmas C.*, 721 A.2d at 630.

DHHS placed G.M. in a therapeutic foster home, where her health steadily improved. DHHS also worked with G.M.'s parents to develop a reunification plan, and assigned defendant Kristen Nichols, a social worker, to assist in the reunification effort. Following a psychiatric evaluation of Miller, DHHS determined that reunification services should be provided to the parents separately. Mahood relocated to a separate residence from Miller, and G.M. had regular supervised visits with each of the parents individually. However, despite a court-approved agreement between the parties mandating Mahood's "separation from [Miller] 'in all areas,' " as a condition of reunification, Mahood and Miller maintained a relationship with each other.

Ultimately, DHHS concluded that reunification efforts had been unsuccessful. On October 16, 2006, DHHS filed a petition for the Termination of Parental Rights, alleging that G.M.'s biological parents remained unable or unwilling to protect G.M. from jeopardy and were "unable or unwilling to change in a timeframe designed to meet the needs of their daughter."

Between August and December of 2007, the Maine district court held nine days of hearings, reviewing testimony from twenty-one witnesses, including Miller and Mahood. On January 23, 2008, the court issued a thirteen-page order. After comprehensively evaluating the evidence that Miller and Mahood were unfit parents for G.M., the state court found that Miller suffered from "severe untreated mental health issues" and Mahood demonstrated deficient protective judgment.

The court specifically concluded that "Miller's lack of insight into her own mental health issues and her inability to recognize any contribution she or Mr. Mahood made to G.M.'s failure to thrive and developmental delays, in the face of the overwhelming evidence in th[e] record, provide[d] clear and convincing evidence" that she was "unable to protect G.M. from jeopardy" and was unlikely to change in a reasonable period. It also found that Mahood similarly "continue[d] to lack insight as to the reason for G.M.'s removal [and] continue[d] to show no appreciation for the impact of his failure to exercise independent protective judgment on [G.M.'s] failure to thrive and the developmental delays

from which she may never recover." These conclusions, among others, supported the court's determination that Miller and Mahood's parental rights had to be terminated.

The state district court further held that DHHS "ha[d] made reasonable efforts to rehabilitate and reunify the family," citing a variety of services that the agency had provided the family. Noting that G.M.'s foster parents were prepared to adopt her, the court concluded that it was in the best interest of G.M., who had been in foster care for more than two years, that parental rights be terminated.

Miller, Mahood, and G.M.'s guardian ad litem all filed requests for additional findings of fact and conclusions of law. On February 7, 2008, the state court issued an order, responding to some of the requests and deeming further findings unnecessary.

Miller and Mahood appealed the termination order to the Maine Supreme Judicial Court. On August 12, 2008, the Law Court affirmed the judgment. Its brief opinion held that the state trial court "could have found clear and convincing evidence in the record" to support its determinations and that the "argument that [DHHS] did not engage in legitimate reunification efforts [wa]s not supported by the record." *In re G.M.*, Decision No. Mem. 08–149 (Me., Aug. 12, 2008). The parents' subsequent motion to reconsider was denied.

On October 22, 2008, Miller and Mahood filed a complaint in the federal court in Maine against both Nichols and her supervisor, Brenda Harvey, the commissioner of DHHS. The complaint sought injunctive and declaratory relief to prevent G.M.'s adoption by her foster family, as well as damages under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Health Insurance Portability and Accountability Act ("HIPAA"), and for various constitutional claims under 42 U.S.C. § 1983.

The complaint alleged in part that during the period when she served as G.M.'s caseworker, Nichols made no effort to accommodate Miller's possible mental illness and was consistently biased in favor of G.M.'s foster parents, and that this violated the ADA and Rehabilitation Act. Plaintiffs claimed that Nichols sought to condition Mahood's reunification with his daughter on his promise never to associate with Miller, in violation of both parents' First Amendment rights to free association. They also argued that Nichols threatened them with termination of parental rights if they did not waive their religious objections to immunizing G.M., in violation of their First Amendment rights to religious freedom. They further asserted that Nichols deliberately disclosed unfavorable information from Miller's mental health records during a court-ordered medical evaluation of G.M., while withholding more favorable information, in violation of HIPAA.

On January 9, 2009, the federal district court of Maine held that it lacked subject matter jurisdiction over plaintiffs' claims for injunctive and declaratory relief under the *Rooker–Feldman* doctrine. *Miller v. Nichols*, 592 F.Supp.2d 191, 196 (D.Me. Jan. 9, 2009). It further found that plaintiffs' claims for damages were barred by the doctrine of issue preclusion and that, in any event, plaintiffs had no private right of action for HIPAA violations. *Id.* at 194–95 & n. 1. Accordingly, it granted defendants' motion to dismiss. This appeal followed.

## II.

█ The existence of federal subject matter jurisdiction, of a cause of action, and the applicability of res judicata, in the form of issue preclusion, are questions of

law, subject to de novo review in this court. *See Amoche v. Guar. Trust Life Ins. Co.*, 556 F.3d 41, 48 (1st Cir.2009) (subject matter jurisdiction); *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51 (1st Cir.2008) (failure to state a claim); *Global NAPs, Inc. v. Mass. Dep't of Telecomm.*, 427 F.3d 34, 43 (1st Cir.2005) (issue preclusion).

### A. *Rooker–Feldman Precludes Jurisdiction over Plaintiffs' Motion for Injunctive Relief*

■ The district court correctly determined that it lacked subject matter jurisdiction to review plaintiffs' motion for injunctive relief to prevent G.M.'s adoption. The *Rooker–Feldman* doctrine precludes federal jurisdiction over a challenge to a state court judgment to which the challenger was a party.[1] *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005); *Puerto Ricans for P.R. Party v. Dalmau*, 544 F.3d 58, 68 (1st Cir.2008); *see generally* 18 Wright, Miller & Cooper, *supra*, § 4469.1. Only the Supreme Court of the United States may invalidate state court civil judgments. *Exxon Mobil Corp.*, 544 U.S. at 292, 125 S.Ct. 1517.

■ Federal courts' application of the *Rooker–Feldman* doctrine "does not depend on what issues were actually litigated in the state court."[2] *Maymó–Meléndez v.*

Álvarez–Ramírez, 364 F.3d 27, 33 (1st Cir. 2004). Rather, *Rooker–Feldman* bars jurisdiction whenever "parties who lost in state court . . . seek[ ] review and rejection of that judgment in federal court." *Puerto Ricans For P.R. Party*, 544 F.3d at 68 (internal quotation marks omitted).

Here, plaintiffs' motion for injunctive relief is an effort to do an end run around the state court's judgment. In Maine, an order terminating parental rights explicitly severs biological parents' right to participate in adoption proceedings. 22 M.R.S.A. § 4056(3). The desired injunction would amount to a reversal of the Maine Supreme Judicial Court's ruling on the termination of plaintiffs' parental rights, which permitted G.M. to be adopted. *See id.*; *see also Hoblock*, 422 F.3d at 87. Accordingly, the district court's dismissal of plaintiff's motion for lack of subject matter jurisdiction was both necessary and appropriate.

### B. *No Private Right of Action under HIPAA*

■ Plaintiffs conceded both before the district court and on this appeal that HIPAA does not create a private right of action. The district court properly dismissed plaintiffs' claims on this basis without additional discussion. Plaintiffs' argument that we should devise a new cause of action to accommodate their claim must

---

1. The doctrine has limited exceptions, none of which are at issue in this case. *See* 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4469.1, at 100–01, 127–37 (2d ed. 2002).

2. The Second Circuit recently discussed this point, using a hypothetical similar to the facts of this case, in *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77 (2d Cir.2005). As the court explained, "a federal plaintiff cannot escape the *Rooker–Feldman* bar simply by relying on a legal theory not raised in state court." *Id.* at 87. The court continued:

"Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments." *Id.*

fail. *See Alexander v. Sandoval,* 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.") (internal quotation marks and citation omitted).

C. *The Factual Issues Underlying Plaintiffs' Claims Were Addressed by the State Court and Are Barred by Issue Preclusion*

 The district court also correctly held that the factual issues underlying plaintiffs' remaining claims were addressed by the state court's judgment and cannot be relitigated under the doctrine of issue preclusion. Issue preclusion reflects the fundamental principle that courts should not revisit factual matters that a party previously litigated and another court actually decided. *See, e.g., Enica v. Principi,* 544 F.3d 328, 336 (1st Cir.2008); *see also* 18 Wright, Miller & Cooper, *supra,* § 4416, at 386–87. It is well settled that state court decisions have the same preclusive effect in federal courts that they would have in the state where the judgment was issued. *See Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). "Federal courts may not employ their own rules . . . in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken." *Id.* (internal quotation marks omitted); *see also Westcott Constr. Corp. v. Firemen's Fund of N. J.,* 996 F.2d 14, 16 (1st Cir.1993); 18 Wright, Miller & Cooper, *supra,* § 4469, at 72–73. We look to Maine preclusion law.

 Maine courts apply a two-part test to determine if issue preclusion applies, asking first "if the identical issue was determined by a prior final judgment" and second if "the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding." *Portland Water Dist. v. Town of Standish,* 940 A.2d 1097, 1099 (Me.2008) (internal quotation marks omitted). The doctrine precludes courts from revisiting factual matters that meet this test, even when a second action seeks a different remedy than the initial litigation. *Id.; see also Macomber v. MacQuinn–Tweedie,* 834 A.2d 131, 139 (Me. 2003).

 Mutuality of parties is not required for issue preclusion. As plaintiffs concede in their brief, their argument that the parties to the prior action must be identical for issue preclusion to arise finds no support in Maine law. *See Hossler v. Barry,* 403 A.2d 762, 767 (Me.1979) (finding mutuality of parties unnecessary for application of issue preclusion); *see also* 18 Wright, Miller & Cooper, *supra,* § 4464, at 692.

 We first address whether the identical factual issues plaintiffs raise in federal court were previously decided in the Maine state courts' proceedings. Plaintiffs' federal district court complaint alleges that Nichols violated their statutory and constitutional rights by not making adequate efforts to reunify the family. The precise mechanisms for their failure were alleged to be: neglecting to accommodate Miller's disability, unlawfully sharing damaging mental health information with a state evaluator, falsely claiming to be a licensed social worker, inappropriately insisting that Mahood cut ties with Miller to avoid termination of his parental rights, and threatening to terminate plaintiffs' parental rights if they did not waive their religious objections to vaccinating G.M. Plaintiffs sued defendant Harvey under a theory of supervisory liability for Nichols's conduct.

■ Although plaintiffs make a variety of claims, the theme of their briefs in both the federal district court and this court is the failure to accommodate the parents' needs in the context of the reunification obligation.[3] Their arguments in any event depend on an identical factual issue—the alleged biased failure to accommodate—and, for purposes of issue—preclusion analysis, are one and the same. Plaintiffs' complaint also references violations of civil rights, identifying only First Amendment religious and associational rights and privacy rights that they allege were violated during the reunification process. The state court proceedings addressed the factual issues underpinning each of these claims.

We do not accept plaintiffs' assertion that a state court has only addressed an issue for purposes of issue preclusion if the earlier state court opinion contains an explicit discussion of the facts. That is not the law.[4] *See Grubb,* 281 U.S. at 477–78, 50 S.Ct. 374; *see also Hoult v. Hoult,* 157 F.3d 29, 32 (1st Cir.1998); 18 Wright, Miller & Cooper, *supra,* § 4420, at 521. Nor do we reach the state's argument that the entry of any termination order necessarily means that the court found, as a matter of fact, that DHHS made reasonable but unsuccessful efforts at reunification and this necessarily, as a matter of law, precludes any further claims of lack of reasonable accommodations. Instead, we find that, on this record, plaintiffs actually made, and the state courts addressed, the contention that the state social work agency was biased and had not accommodated the parents' needs.

■ Under Maine law, courts may review the record and assess specific findings made by the prior court to determine precisely what issues were addressed in a prior judgment. *See Macomber,* 834 A.2d at 139–40 (evaluating the record as well as a previous court's order before concluding that issue preclusion did not bar plaintiff's claim); *see also* 18 Wright, Miller & Cooper, *supra,* § 4420, at 510, 520.

An explanation of the Maine law on termination of parental rights sets the stage for our evaluation of the factual issues addressed in the state court proceedings. Under the state statute, 22 M.R.S.A. § 4041, DHHS must make "good faith efforts" to cooperate with parents in pursuit of reunification. *Id.* at 1–A(A)(3). This

---

3. Plaintiffs have failed to identify any purported violations of their civil rights other than those related to the alleged deficiencies in the reunification process. All other arguments are waived.

We are making no determinations about whether the ADA or the Rehabilitation Act in fact impose any obligation to accommodate disabilities on a state in this context. It is clear though that § 504 of the Rehabilitation Act prohibits discrimination but does not require "affirmative efforts to overcome the disabilities caused by handicaps." *Se. Cmty. Coll. v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979).

In particular, we do not get into whether plaintiffs are "qualified individual[s]" who have been "denied the benefits of ... services, programs, or activities" "by reason of" their disability under the ADA. 42 U.S.C. § 12132.

*Cf. Buchanan v. Maine,* 469 F.3d 158, 173–74 (1st Cir.2006). The Maine Law Court has previously considered a case in which a mother contested the termination of her parental rights on the basis of the DHHS's alleged violations of the ADA. *See In re Angel B.,* 659 A.2d 277, 279 (Me.1995). The court determined that the mother had failed to demonstrate any denial of services but did not explicitly address whether the ADA authorized her claim. *Id.*

4. Plaintiffs' variant on the argument is that there is no preclusion if the state courts did not resolve the statutory and civil rights issues by naming those statutes. That argument fails. *Grubb v. Pub. Util. Comm'n of Ohio,* 281 U.S. 470, 477–78, 50 S.Ct. 374, 74 L.Ed. 972 (1930).

obligation arises as soon as the child is deemed to have entered foster care. *Id.* at 1–A.

The record reflects that plaintiffs vigorously challenged at every turn the reasonableness of social worker Nichols's efforts at reunification. For example, they elicited testimony from Nichols about her handling of Miller's mental health. On cross-examination, counsel for one of the parents questioned Nichols directly about her familiarity with the ADA and made repeated inquiries into any "reasonable accommodations" she made for Miller's disability.

The state district judge rejected this line of reasoning and concluded that, based on the evidence before her, DHHS "ha[d] made reasonable efforts to rehabilitate and reunify the family and to finalize the permanency plan by providing extensive supervised visitation, counseling for the mother, a therapeutic foster home, in-home parenting, and caseworker services." Whether or not required by Maine law to make such a determination, explicitly or implicitly, in order to terminate parental rights, the district court specifically identified a series of reasonable steps taken by DHHS to address G.M.'s family's needs in light of the parents' circumstances. In doing so, the court rejected plaintiffs' factual assertions to the contrary.

Miller revisited these factual issues in her motion for further findings, which urged the court to find that Nichols had shared records "identifying ... Miller as having a mental illness" and that Nichols failed to accommodate Miller's "mental health disability." Mahood's motion for further findings of fact suggested that the court should reject Nichols's testimony on Mahood's cooperation in the reunification effort outright. The court declined to do so. Instead, its order on these motions emphasized the "careful consideration"

that it had already given "to all the evidence presented."

Plaintiffs argued these factual issues yet again before the Maine Supreme Judicial Court. Mahood specifically sought review of whether DHHS's reconciliation efforts were "appropriate." The Law Court affirmed the district court's judgment and explicitly held that "the father's argument that the Department did not engage in legitimate reunification efforts is not supported by the record."

Following the rejection of plaintiffs' arguments on appeal, plaintiffs filed a motion for reconsideration. In their motion, they persisted in urging consideration of the fact that defendant Nichols "was inexperienced and biased against individuals with a perceived mental health issue." Once more, the Law Court considered this factual matter and ultimately denied plaintiffs' motion for reconsideration.

Plaintiffs assert that the issues raised in the federal complaint were not essential to the state court decisions and, if not essential, are not subject to issue preclusion. *See Beale v. Chisholm,* 626 A.2d 345, 347 (Me.1993). They say that, as a matter of law, the termination proceeding necessarily concluded only that (1) G.M. was in jeopardy, (2) termination was in the best interests of the child, and (3) the circumstances of the parents' unwillingness or inability to protect the child from jeopardy are not likely to change in time reasonably to meet the child's needs. *See* 22 M.R.S.A. § 4055(1)(A)(1)(a), (B)(2)(a)-(b). This argument ignores both the constituent components of the second finding and what actually happened in the state court proceedings. It fails.

 We now turn to the second prong of issue preclusion under Maine law. For issue preclusion to apply, a party must have a "fair opportunity and incentive to litigate the issue in [the] prior proceeding."

*Portland Water Dist.,* 940 A.2d at 1100 (internal quotation marks omitted). Under Maine law, "[a] party has a *fair opportunity* to litigate an issue if that party either controls the litigation, substantially participates in that litigation, or could have participated in the litigation had they chosen to do so." *State v. Hughes,* 863 A.2d 266, 269 (Me.2004) (emphasis in original).

It is clear that since plaintiffs actually litigated the issues in state court, they had both incentive and opportunity to present the claims. In the face of this obvious fact, they resort to one final argument. They say that their federal claims could not have been litigated before the state court. Plaintiffs rely on Maine R. Civ. P. 80, which precludes counterclaims in cases of determinations of parental rights and responsibilities. But plaintiffs misunderstand the rule. In fact, plaintiffs defensively used arguments that the state had failed to make reasonable efforts to reunify the family because it had not reasonably accommodated whatever disabilities the plaintiffs had.

Finally, because all claims against defendant Nichols are either without merit, precluded, or waived, any claim of supervisory liability against defendant Harvey must also fail. *See, e.g., Rivera v. Rhode Island,* 402 F.3d 27, 38–39 (1st Cir.2005) ("Since the plaintiff has failed to state a constitutional claim at all, her claims against the other defendants for supervisory liability . . . fail.").

We *affirm* the district court's dismissal of all of plaintiffs' claims.