**ESSO STANDARD OIL COMPANY (PUERTO RICO) Plaintiff**

v.

**Esteban MUJICA COTTO, et al., Defendants**

**No. CIV.03–2319 CCC JA.**

United States District Court,
D. Puerto Rico.

June 30, 2004.

Latham & Watkins LLP, Newark, NJ, John F. Nevares & Assoc. PSC, San Juan, PR, for Plaintiff.

Quiñones & Sánchez, PSC, Héctor R. Díaz–González, Esq., Adm. Auxiliar Sevicios Legales, San Juan, PR, for Defendants.

## OPINION AND ORDER

ARENAS, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff Esso Standard Oil Company (Puerto Rico) (hereinafter "Esso") filed the present action against defendants: (1) Esteban Mujica Cotto (hereinafter "Mujica") in his official capacity as president of the Puerto Rico Environmental Quality Board (hereinafter "EQB") and in his personal capacity; (2) Flor Del Valle López ("Del Valle") in her official capacity as current vice-president of the EQB and in her personal capacity; (3) Ángel Berríos Silvestre ("Berríos") in his official capacity as Associate Member of the EQB and in his personal capacity; and (4) Norman Velázquez Torres (hereinafter "Velázquez") in his official capacity as a lawyer of the EQB and in his personal capacity. (Amended Complaint, Docket No. 10.) The present action is brought under the provisions of 42 U.S.C. § 1983 for violations of rights guaranteed to Esso by the Fourteenth Amendment of the United States Constitution. Supplemental jurisdiction is alleged for claims brought under Puerto Rico law. Esso seeks declaratory and injunctive relief.

The central allegation in Esso's amended complaint is that the EQB has issued an administrative order directing Esso to investigate and cleanup soil and ground water contamination at a gasoline station located in Barranquitas, Puerto Rico. The administrative order also directs Esso to show cause why it should not be fined $75,960,000. Esso maintains that it cannot obtain a fair hearing before the EQB on the proposed penalty since it has been subjected to greatly biased adjudicative proceedings that infringe its rights under the Due Process Clause of the United States Constitution.

This matter is before the court on motion for preliminary injunction filed by Esso on March 3, 2004. (Docket No. 13.) An "Opposition to Plaintiff's Petition for Preliminary Injunction" was filed by all defendants on April 19, 2004. (Docket No. 86.) A hearing was held before me on April 27, 2004. (Docket No. 98.) Esso filed its post-hearing brief on May 12, 2004. (Docket No. 103.) A response in opposition was filed by all defendants on June 10, 2004. (Docket No. 108.) After considering the arguments of the parties, the evidence presented at the hearing and for the reasons stated below, Esso's motion for preliminary injunction is DENIED.

## II. BACKGROUND

This case concerns a gasoline station located on road 156, km. 4.7, at La Vega Ward in Barranquitas, Puerto Rico (hereinafter "the station"). Carlos Rodríguez Pérez (hereinafter "Rodríguez") assumed control of the station in 1971. In May, 1979, Rodríguez entered into a contract with Esso for the lease of storage tanks and for the purchase of fuel supplies. He operated the station, including its tank system, until the Barranquitas Fire Department ordered the station closed in August, 1998.

Prior to 1991, the station's fuel was stored in an underground storage tank (hereinafter "UST") system consisting of two 4,000–gallon storage tanks for premium and regular gasoline and one 2,500–gallon above-ground storage tank for diesel. In 1991, Esso replaced the UST system with two 10,000–gallon storage tanks and one 4,000–gallon above-ground tank respectively. In 1992, Rodríguez filed suit against Esso in the Puerto Rico Court of First Instance, Bayamon Superior Part alleging the loss of approximately 65,000 gallons of gasoline from the old UST system. Over the years, the claimed loss has grown to 80,000 gallons (as reported to the

National Response Center in 1997) and even 100,000 gallons (as reported by the EQB in 1998).

The EQB is an administrative agency created under the laws of the Commonwealth of Puerto Rico, specifically under the Environmental Public Policy Act, 12 P.R. Laws. Ann. § 1121 *et seq*, to promote conservation of the environment and the natural resources of Puerto Rico. In its enforcement capacity, the EQB has authority to issue "Orders to Do" to compel compliance with environmental statutes and regulations. Pursuant to this authority, in August, 1998, the EQB issued an order ("first order") directing Esso to empty and test the integrity of the station's UST system. Esso promptly complied, conducting a preliminary site assessment and submitting a report with its findings to the EQB. Esso reported, *inter alia*, (1) that a total of 1.74 gallons of fuel were found and recover from the 12 new monitoring wells that Esso had installed; (2) that the replacement UST system installed in 1991 was intact and had not leaked; and (3) that ambient and air testing revealed no adverse impact due to the alleged fuel release.

On September 8, 1998, the EQB issued another order ("second order") directing Rodríguez, Esso and the owners of the land to immediately undertake certain geophysical tests, perform a horizontal and vertical characterization of the area, place a product-gathering barrier along the banks of a river running behind the station (the Piñonas River), and prepare a soil remediation plan. Esso delivered the requested remediation plan within 48 hours and promptly submitted the work plan for the geophysical investigation.

During this time, the EQB transferred enforcement responsibilities and oversight of the station from the EQB's UST program to a special committee. The transfer

was allegedly motivated by claims of corruption orchestrated by Carlos Belgodere Pamies (hereinafter "Belgodere") who worked as a consultant for Rodríguez. The committee apparently failed to give timely responses to Esso's work plan, thus delaying implementation of corrective measures. Esso's efforts to ascertain the presence of any environmental impact at the station premises and surrounding areas, were hindered by the EQB's alleged failure to approve the submitted plans despite the fact that Esso repeatedly indicated its availability and interest in resuming field investigation activities. It is also claimed that both Rodríguez and Belgodere denied or interfered with Esso's access to the station in order to resume some of the field work. Notwithstanding Esso's compliance with the first order and its demonstrated willingness to comply with the second one, a third order to do ("third order") was issued by the EQB on October 25, 1999. Said order superceded and expanded on some of the requirements of the second order.

Esso submits that it has substantially completed the site investigation and evaluation required by the third order,[1] despite the EQB's delay in approving the work plans and despite significant interference on the part of Rodríguez and Belgodere. Investigation and remediation efforts by Esso revealed and recovered about 550 spilled gallons of fuel which evidently is inconsistent with the claims made by Rodríguez and Belgodere of a spill of over 100,000 gallons.

On May 21, 2001, and despite Esso's efforts to reduce the environmental impact at the station premises, the EQB issued a show cause order in which a $75,960,000 fine was proposed against Esso.[2] The grounds for the show cause order are Esso's alleged failure to notify the EQB upon discovery of the product release and the failure to timely investigate, clean up and remedy the potential harm presented by said product release. The order also directed Esso to perform further remedial activities. However, it does not propose a sanction against Rodríguez even though he had complete control over the USTs and despite an EQB examiner's[3] suggestion that Rodríguez should be deemed potentially responsible for the regulatory violations.

The unprecedented $76,000,000 fine proposed against Esso in this case is 500 times greater than the fines imposed nationwide for similar actions. The fine is also 5,000 times greater than the largest fine imposed by the EQB pursuant to its UST regulations. Esso moves the court to enjoin the administrative proceeding to enforce the proposed penalty, and to declare the same unconstitutional.

### III. THE POSITIONS OF THE PARTIES

#### A. *Plaintiff*

Esso seeks to enjoin the administrative proceedings under which it could be the subject of an unprecedented $76,000,000 fine arguing that its right to due process of

---

1. The efforts include drilling exploratory borings to collect soil samples, installing additional monitoring wells, taking measurements of the existing ones, sampling underground water, conducting vapor readings and collecting ambient air samples.

2. The EQB may institute a proceeding to determine the imposition of an administrative penalty under the belief that a violation of the

Environmental Public Policy Act or a promulgated regulation has occurred. The EQB institutes the proceedings with the issuance of a show cause order requiring a party to present evidence and arguments against the imposition of the fine.

3. This prior hearing examiner was in charge of ensuring compliance with the third order.

law is violated by said proceedings. The specific allegation is that the officials who decide whether this massive fine is assessed have severe and irremediable conflicts of interest. It is claimed that the co-defendants Mujica, Del Valle, and Berríos, all members of the EQB governing board, are substantially biased against Esso in different levels, which renders them incapable of providing a fair hearing in harmony with the Due Process Clause.

First, Esso contends that the EQB has a direct pecuniary interest in the outcome of the administrative proceeding creating an unconstitutionally fatal structural bias. Under the EQB's enabling act, the $76,000,000 fine would go directly into a special account administered by the EQB. 12 P.R. Laws Ann. § 1136(f), (k). Said special account is at the disposal of the board and the monies of the account may be disbursed through a payment order authorized or signed by the Chairman of the Board. 12 P.R. Laws Ann. § 1131(16)(A). According to Esso, the board members cannot fairly and constitutionally preside over an administrative proceeding to determine if Esso must pay a $76,000,000 fine which they get to spend afterwards. Esso notes that the $76,000,000 penalty is more than twice EQB's yearly budget.

Furthermore, Esso argues that the Puerto Rico Senate has exerted undue influence over the administrative proceedings rendering the process against Esso fatally biased. On October 18, 2001, the Senate ordered the Senate's Commission on Agriculture, Natural Resources and Energy to investigate the alleged fuel releases at the station. The Senate's Commission on Government Integrity joined the investigation shortly thereafter. These investigations were allegedly instigated by Belgodere. In March of 2003, both Commissions met in executive sessions with co-defendant Velázquez who was acting as the attorney presenting the

case against Esso. However, even though the Commissions permitted Esso to present testimony in certain open hearings, it did not allow Esso to attend the March 2003 executive session or any other executive session for that matter.

It is further contended that after these sessions, the Commissions unabashedly prejudged the merits of the pending EQB hearing. They found without substantiation that a significant spill occurred at the station and that Esso indeed failed to report, contain, clean up and mitigate the spill in violation of EQB regulations and directives. The Senate Commissions accused the EQB of neglecting the health and welfare of La Vega residents and of not being harsh enough with Esso. The EQB was further accused of acting timidly and of having been "captured" by Esso. The Commissions also urged fines sufficiently high to dissuade any potential violator, and felony prosecutions for those who spill petroleum, fail to report it, and do not clean it up effectively. Finally, the Commissions threatened EQB officials with criminal prosecution and with referring those officials who in the opinion of the Commission members had been lax, to the Office of Government Integrity for an investigation.

According to Esso, the message sent by the Senate Commissions was to find Esso responsible and to impose a large fine against it or else EQB officials would be the subject of Ethics probes and criminal prosecutions. Esso moves to enjoin the proceedings arguing that they will be conducted, initially by the hearing examiner and ultimately by the board members under the shadow of those threats made by the Senate. Such actions, Esso maintains, are depriving it of its right to a fair hearing.

Next is Esso's claim of structural bias with respect to the procedures and prac-

tices leading up to the issuance of the show cause order. Esso avers that the issuance of the order was not consulted with the third member of the board. Instead, it was considered privately by former president of the EQB Gladys González and by co-defendant Del Valle without consulting Jorge Marrero, who in Esso's opinion had more knowledge about the case and would have strongly questioned the order. Other high ranking staff members of the EQB were not consulted despite being directly related to the case.

In addition, it is claimed by Esso that the EQB had knowledge of the facts as early as 1991. Nevertheless, the EQB never provided Esso with a notice of violation which is required by its own regulations. A notice of violation would have informed Esso of the specific actions or omissions alleged to be unlawful and would have given Esso the opportunity to take corrective measures and even prevent the penalty assessment. The show cause order, Esso argues, contains only extraordinarily vague and sweeping allegations essentially placing it in the position of having to defend against a $76,000,000 fine without having being informed of the particular charges made against it.

Esso also claims substantial bias in the selection process of EQB hearing examiners and particularly the current hearing examiner. Hearing examiners at the EQB do not enjoy the civil service protections afforded to other government employees which shields them from the pressures of political appointments. On the contrary, hearing examiners at the EQB are independent contractors whose relationship is defined by the terms of their employment contracts. Their compensation depends on the president's willingness to assign cases to them and they are paid on an hourly basis with no fixed salary. In accordance with the terms of their contracts, hearing examiners at the EQB owe an ethical duty of complete loyalty to the agency. They can be terminated at will with 30 days notice.

Esso argues that two prior hearing examiners assigned to enforce the show cause order were dismissed by the agency and their contracts were not renewed. Apparently, these examiners disagreed respectively with the decision of proposing a fine only against Esso and not against Rodríguez and with the agency's decision of not allowing Esso to conduct any discovery. Esso also maintains that the hearing examiner currently assigned to the show cause order proceedings has demonstrated her bias against Esso with her statements. It is asserted that said examiner, attorney Yolanda Torres Roque, has insinuated that she would not adjudicate the case in Esso's favor no matter the evidence, and has indicated that Esso would be the party filing an appeal to request review of her decision. The bias exhibited by Torres Roque is in Esso's opinion another example of the lack of fairness characterizing the administrative proceeding. Esso contends that even with her rulings, Torres–Roque has prevented Esso from presenting a meaningful defense. Among others, Esso argues that Torres Roque has not allowed it to conduct discovery, even though the Puerto Rico Uniform Administrative Proceedings Act provides that an agency must guarantee the right to discovery to a respondent in cases in which the proceedings have been promoted by the agency's own initiative. 3 P.R. Laws Ann. § 2158. There are other allegations of bias as to the unfair manner in which Torres Roque is conducting the proceedings. Accordingly, it is Esso's position that the lack of independence of the hearing examiners violates its right to a fair hearing in accordance with Due Process.

Another allegation ostensibly affecting the fairness of the administrative proceed-

ing is the claim of conflict of interest and misconduct on the part of co-defendant Velázquez and the allegation of undue influence on the part of Belgodere. The actions of both individuals have, according to Esso, infected the proceedings to such a degree as to require this court's intervention.

With respect to co-defendant Velázquez, the general contention is that the EQB members have allowed him to incur in grossly unethical behavior which includes conflict of interest, making false statements in pleadings, harassing Esso's counsel during hearings, and making defamatory statements without sanction or reproach. Velázquez was appointed project manager responsible for overseeing and approving compliance efforts at the station. Esso alleges that it was in this role that Velázquez caused numerous delays in the cleanup process for which he was eventually replaced. However, in obvious disregard of the possible conflict, Velázquez was appointed attorney for the public interest seeking to impose the $76,000,000 penalty on Esso. In this process, Velázquez has submitted evidence of Esso's delay in the cleanup of the station, when such delays were caused by Velázquez' own conduct. Also, Velázquez' relationship with Belgodere creates an appearance of bias since Belgodere is a consultant possibly responsible for the environmental impact at the station and a person who has shown a violent animus toward Esso. Similar allegations of unethical conduct on the part of Velázquez are identified by Esso as suggesting to witnesses how to testify, attempting to hide an expert's report favorable to Esso, tampering with evidence and disobeying a federal subpoena.

With respect to Belgodere, Esso submits that the EQB has allowed him to exert undue influence in the present matter. It is generally claimed that Belgodere has, through intimidation, assaults, threats of disfigurement and of murder, impeded Esso's investigative efforts at the station. Despite this conduct, the EQB, and particularly Velázquez, have treated Belgodere as a trusted confidant. It is claimed that Belgodere is in fact behind the current proceedings when, by his own admission, he instigated the Senate's investigation. Similarly, as a consultant for Rodríguez and the neighbors at La Vega, Belgodere has continuously pushed for the EQB's intervention and for punishment of Esso. Esso also asserts that Belgodere has claimed to control one or more EQB board members and can therefore direct the outcome of the administrative process. He has also told an Esso official—Rosana Roig—that the situation at La Vega could be resolved by Esso paying $6 million to the "community" and $2 million to Rodríguez. Belgodere has even suggested that he has the ability to make the proposed fine against Esso "go away." According to Belgodere, he holds evidence that one or more high ranking EQB officials have been selling permits. He insinuates that he can use this leverage to direct the outcome of the proceedings against Esso. Esso in turn has refused to pay.

Finally, Esso adduces that Belgodere has exhibited a violent animus against it. There have been threats to and assaults on Esso officials and contractors for their participation at the station. Esso's engineer José Cardona was allegedly threatened by Belgodere and harassed with racial epithets and a threatened fist fight. There is also an allegation that Belgodere threatened Esso's engineer Marla Rivera for which she filed a complaint with the Puerto Rico police. He has also incited residents of La Vega to scream at and intimidate Esso representatives. For instance, in October, 2002, Belgodere is alleged to have threatened Rivera saying that there would be death, shootings, and

bottles with gas and fire at the station. Later that evening, a Molotov cocktail was thrown at the station. On July 16, 2001, Belgodere told Rosana Roig that he would identify where the children of an Esso executive went to school to tell them that their father was killing the children of Puerto Rico. Additionally, Lourdes Pagán—former Director of EQB's legal division—was told by Belgodere on June 9, 2001, that "blood shall be spilled" and that she would be the fifth attorney he got rid of. Pagán interpreted this as a threat of physical violence. In sum, it is Esso's position that the EQB has allowed Belgodere to infect even more an already biased proceeding.

Based on the foregoing, Esso maintains that it cannot obtain a fair hearing on the proposed $76,000,000 fine. It is Esso's position that such unfairness requires the court's intervention to enjoin a proceeding that offends one of the most fundamental principles of due process of law: an impartial adjudicator. It also seeks a declaration that the process as applied to it is unconstitutional.

### B. Defendants

■ Contrary to Esso, who relies largely on factual averments, the defendants raise general questions of law in their opposition to a preliminary injunction. The defendants claim that the relief sought by Esso is beyond this court's authority to provide. They maintain in general that the court's consideration of Esso's preliminary injunction petition is barred by the *Younger* abstention doctrine.[4] Additionally, they argue that inasmuch as the quasi-judicial administrative process has not concluded, no penalty has been imposed on Esso, and there is no relief that could be granted. It is also submitted that the co-defendants are entitled to Eleventh Amendment immunity in their official capacities and to quasi-judicial immunity in their individual capacities. Finally, the defendants contend that Esso cannot show that it has satisfied the requisite elements for the granting of injunctive relief.[5]

Specifically, the defendants claim that Esso has failed to demonstrate a probability of success on the merits. The reason is that the adjudicative proceedings have not concluded and the proposed fine is not final. Additionally, the defendants argue that Esso has an opportunity to submit evidence in its favor and defend itself against the proposed penalty. The defendants therefore conclude that a preliminary injunction may not issue.

Furthermore, it is the defendants' position that the Commonwealth of Puerto Rico has an important interest in the environment of the island and in the enforcement of its own environmental laws and regulations. Esso is seeking, according to the defendants, to have the court interfere with a state administrative agency that should be the one, in the exercise of its jurisdiction, to decide whether a violation of the UST Control Regulation and the Water Quality Standard Regulation occurred. Additionally, the defendants adduce that *Younger* abstention is warranted since Esso has an opportunity to raise any constitutional issues at the state proceed-

---

4. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

5. Four factors must be considered in the determination of whether a movant is entitled to a preliminary injunction:
 (1) the movant's probability of success on the merits, (2) the likelihood of irreparable harm absent preliminary injunctive relief, (3) a comparison between the harm to the movant if no injunction issues and the harm to the objectors if one does issue, and (4) how the granting or denial of an injunction will interact with the public interest.
 *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 8–9 (1st Cir.2002) (citing *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir.1996)).

ings and to seek appellate review in the Puerto Rico court system.

With the above as framework and after reviewing the testimony and evidence submitted at the hearing, I now enter the following

## IV. FINDINGS OF FACT

### A. *Background*

1. Esso gasoline station I–074 located on road 156, Km. 4.7, in the La Vega Ward in Barranquitas, Puerto Rico, has been operated since the 1940's. (Preliminary Injunction Hearing Transcript, Docket No. 100, at 21, Plaintiff's Exhibit I, at 1.) In the early 1970's Carlos Rodríguez Pérez became the operator until it closed. (Tr. at 22.) Esso owned the underground storage tanks (USTs) and supplied gasoline to the station. In 1990, Esso replaced the UST system. (*Id.*) These new tanks remained at the station since 1991 until they were removed in 2003. (*Id.* at 23.)

2. This case concerns allegations of product release from the station's UST system both prior and subsequent to the installation of the new tanks in 1990.

3. On May 21, 2001, the EQB issued an administrative order directed to Esso to show cause why it should not be fine for $75,960,000 in relation to the La Vega station. (Plaintiff's Exhibit I.) This order is directed only against Esso and not against Rodríguez who was the operator of the station and who was part of three previous orders to do. (Tr. at 24.)

4. Esso requested that administrative hearings be conducted on the order to show cause. The hearing process began on September 16, 2002. (Tr. at 25.) By February of 2004, the EQB rested its case. (*Id.*) Esso began its defense in chief on March 15, 2004. (*Id.*) So far, Esso has presented three fact witnesses. (*Id.*) The hearing is now recessed on account of counsel substitution on the part of the EQB.[6] (*Id.*) It is scheduled to resume on August 10, 2004. (*Id.* at 20.)

### B. *The Administrative Hearings and the Hearing Examiner*

5. The current hearing examiner (hereinafter "HE") assigned to conduct the administrative proceedings on the order to show cause against Esso is attorney Yolanda Torres–Roque. (*Id.* at 26.) Her employment contract with the EQB states in its fifteenth clause that Ms. Torres–Roque "acknowledges that in the performance of her professional function she has a duty of complete loyalty towards the agency, which includes not having adverse interest to said governmental entity." (Plaintiff's Exhibit II, at 5, ¶ 15.) HE's are also paid by the EQB and can be terminated without cause. (Tr. at 29.)

6. Esso has filed several motions throughout the course of the administrative proceedings. (*Id.*) Initially, Esso filed several motions for essentially summary judgment on statute of limitations grounds and for the EQB's failure to issue a notice of violation. (*Id.* at 29–30.) The HE denied said motions. Additionally, Esso filed motions for accelerated dismissal arguing due process violations. (*Id.* at 30.) The HE stated that she would issue a recommendation to the Board on those motions. (*Id.*) She has not done so. (*Id.*) Another motion claiming that the EQB failed to present a *prima facie* case was filed by Esso and was never opposed by the EQB despite the fact that the HE gave it 10 days to do so. (*Id.*) There has been no ruling on such motion. (*Id.*) Esso also filed a motion to stay the proceedings.

6. The official appointed to represent the public interest on behalf of the EQB was co-defendant Velázquez, who tendered his resignation due to irreconcilable positions. The EQB is now represented by two attorneys, Melvin Sotomayor and Samuel Acosta.

(*Id.* at 30–31.) That one was denied by the HE the next day, but it was submitted to the Board which can rule on it if it so chooses. (*Id.* at 31.) The Board has not acted on the motion to stay. (*Id.*)

7. At the administrative hearings, the EQB presented Katherine Batista, the director of the EQB's UST Program as a witness. (*Id.* at 33.) She was on the stand at the administrative forum for three days. (*Id.*) Esso was not allowed to cross-examine Batista on the issue of penalty calculations. (*Id.* at 33–34.) The HE ruled, upon co-defendant Velázquez' objection, that penalty calculations were not a subject addressed during her direct examination. (*Id.* at 35.) Esso was precluded from ascertaining, from whom they claim had the most knowledge regarding the present penalty calculation, how the EQB arrived at the proposed fine of $76,000,000. (*Id.* at 33.) Velázquez claimed in addition that the penalty calculations were privileged information protected as attorney work product. (Tr. at 35, Plaintiff's Exhibit 4.)

8. In August, 2003, Esso announced the discovery of new evidence. (Tr. at 38.) José Graziani, an EQB employee in charge of overseeing the remediation process would testify about his findings, which among others included over 500 photographs and reports suggesting that Esso had installed "dummy wells" (monitoring wells incapable of detecting contamination). EQB moved to have this new evidence admitted. (*Id.*) The motion was not served on Esso and it was granted by the HE ex-parte. (*Id.*) The reports and photographs were shared with Belgodere who called Esso lawyers to tell them that the evidence was so damaging that it was going to essentially get rid of the federal cases filed by Esso. (*Id.*) Velázquez agreed for Esso counsel to interview Graziani. But the interview was cut short because,

as stated by Velázquez, they had other commitments. (*Id.* at 40.)

9. Esso moved for reconsideration of the ruling granting EQB's motion to present the evidence gathered by Graziani or for an opportunity to depose him. (*Id.* at 42.) Both motions were denied. Subsequently, Esso subpoenaed Graziani in the CERCLA case. (*Id.*) Motions were submitted to the HE for deposing Graziani prior to taking the stand and for adjournment until deposed in the CERCLA case. (*Id.* at 43.) The motions were ignored by the HE and denied by her the day of the hearing. (*Id.* at 44.)

10. Eventually, Esso was able to depose Graziani in the CERCLA case. (*Id.* at 49.) Confronted with additional photographs and information, Graziani concluded that he had made a mistake, an error in judgment regarding the dummy wells. (*Id.* at 49–50.) He attributed said mistake to incomplete information provided by the EQB. (*See* Plaintiff's Exhibit VI.) Velázquez tried to remove portions of the Graziani deposition regarding monitoring wells over Esso's objection. (Tr. at 53–54.)

11. Miguel Morales is an attorney who has worked for the EQB for 18 or 19 years. (Tr. at 97.) Morales has served as interim president of the EQB on two occasions. (*Id.* at 98.) He is currently a supervising attorney of the legal affairs office at the EQB and has at some point supervised HEs. (*Id.*) Morales was also involved in the preparation and drafting of the first two orders served on Esso. (*Id.* at 100, 102.)

12. The first order was served on Esso on August 6, 1998. (*Id.* at 101.) It required that Esso empty the USTs at the station and to test the integrity of the systems. (*Id.*) Esso promptly complied according to Morales, who was at the time interim president of the Board. (*Id.*) Morales was not comfortable with the speed in

which the EQB was responding to the Barranquitas issue and concerning what Esso proposed. (*Id.* at 102.)

13. Morales did not have knowledge of the third order and he testified that he learned of the order to show cause through the press. (*Id.* at 103.) Morales has stated that the proceedings against Esso have been conducted differently than other leak cases. (*Id.* at 105.) It has been given more emphasis. (*Id.*) In the past, investigations on gasoline spills were not carried out by Board with rigor. (*Id.* at 108.) This case has been given a different treatment. (*Id.* at 108–09.) It has been handled more rigorously and more attention has been given. (*Id.* at 109.)

14. With respect to the May 21, 2001 order to show cause, Morales has stated that some of the information included in the findings of fact appear to be taken from Belgodere. (*Id.* at 107.)

15. In addition, Morales has referred to the Esso case, at least in regards to the first two orders, as a "tempest in a tea pot." (*Id.* at 111.) Morales claims that the reason for such comment is that he had never seen a case with so much controversy and animosity. (*Id.*) The publicity has also moved the EQB to do more than necessary and to give this case a more expedited treatment. (*Id.* at 112.) The pressure from the publicity and from special interest groups promotes that the agency react differently and assign more resources, something that would not happen absent the pressure. (*Id.* at 113.) And historically, spill cases are dealt with directly in the technical area without lawyer intervention except when there is resistance to compliance. (*Id.*) There was no resistance to compliance from the part of Esso according to Morales. (*Id.* at 114.)

16. Morales was surprised by the amount of the fine proposed. (*Id.*) In other spill cases, there had been no penalty imposed at all or, if imposed, they were small. (*Id.* at 114–15.) He remembers a case of a Gulf station in Utuado where the proposed fine was less than $100,000. (*Id.* at 115.) The highest penalty imposed by the EQB has been around $4,300,000. (*Id.*) It was not a UST case; it was a hazardous waste case. (*Id.*)

17. With respect to the duties and responsibilities of the HE, Morales testified that traditionally, the president of the board assigns the cases to the hearing examiners. (*Id.* at 116.) Further, hearing examiners at the EQB are to some degree hired, taking into consideration political affiliation to the party in power. (*Id.* at 117.) This is not an absolute rule, however. (*Id.*)

18. Morales' best recollection is that the first HE assigned to the Esso case was Fernando Olivero Barreto. (*Id.*) He was designated as part of the third order. (*Id.* at 119.) He acted more as a monitor in the case to ascertain Esso's compliance. (*Id.* at 120.) After, Barreto, the EQB assigned José Carlo as HE. (*Id.* at 121.) A third examiner (Carlos López) was designated when the board did not renew Carlo's contract. (*Id.*) Finally, the current HE, Yolanda Torres Roque, was assigned to the case. (*Id.*)

19. According to Morales, the substitution of hearing examiners in this case was very unusual. (*Id.* at 122.) At the EQB, hearing examiners can be replaced by the president at will. (*Id.*) Their contracts can also be canceled at any time without justification. (*Id.* at 23–24.) Furthermore, Morales testified that hearing examiners at the EQB are paid from the same special account in which the fines and penalties imposed are deposited. (*Id.* at 124.) In other words, the HE assigned to Esso's case is paid from the same special account in which the $76,000,000 fine would be deposited if finally imposed and collected.

20. The Board has the authority to revoke a HE. At the EQB, HEs are not administrative law judges. (*Id.* at 125.) They merely preside over the hearings and make recommendations to the board which in turn are free to refuse to adopt the same. (*Id.*) The board can disregard the recommendations of the HE and can reach different conclusions. (*Id.* at 126.)

21. Attorney Torres–Roque is currently the HE most used by the EQB. (*Id.* at 125.)

### C. *Discovery*

22. With respect to discovery, Esso submitted requests for production of documents, interrogatories, and requests for admissions. (*Id.* at 54.) After stating that he had talked to every person involved in the case, Velázquez produced only six boxes of documents declaring that it was everything. (*Id.* at 54–55.) Further investigations and orders to compel discovery in the CERCLA case revealed a number of materials such as field notes which Velázquez and other EQB officials represented did not exist. (*Id.* at 56–73.) Over 1,000 boxes of documents pertaining to the station were also uncovered. (*Id.*)

23. In broad categories, the documents that Esso was able to obtain per court order in the CERCLA action were correspondence never seen, internal technical memoranda, technical reports judging Esso's compliance with the remediation plan, material about Esso's performance and contradicting reports, the lack of which hampered Esso's ability to cross examine witnesses and generally prepare to defend against the $76,000,000 fine in the administrative proceedings. (*Id.*)

### D. *The Senate Investigation*

24. In the summer of 2002, the Puerto Rico Senate, specifically the Commission on Agriculture and Natural Resources and Energy, and the Commission on Government Integrity, held hearings regarding the La Vega station. (*Id.* at 75.) Esso was invited to testify at one of the public hearings. (*Id.* at 76.) EQB officials were also invited. (*Id.*) Co-defendant Velázquez was one of the EQB officials who testified in front of the commissions. (*Id.*) At some point, Velázquez stated that he could not reveal privileged information and requested executive hearings, behind closed doors, to address the commissions on the issue of penalty calculations. (*Id.* at 76–77.)

25. The Senate Commissions issued a partial report on July 10, 2003. (Id. at 77, Plaintiff's Exhibit VII.) Among the conclusions reached by the commissions it was stated that prior to 2000, the EQB had not taken a vigorous positive action to protect the health of the residents of La Vega ward and that it appeared that Esso was the owner of the EQB regulations and decided when to apply them. (Plaintiff's Exhibit VII, at 11.) In addition, the report states that the EQB acted, if indeed it acted, with extreme neglect, inefficiency, and lack of compliance with its legal mandate. (*Id.*) According to the report, the EQB's lack of compliance and neglect was evident from the fact that 10 years transpired before any action was taken. (*Id.*) The commissions further found that the EQB has begun to take action but that it does so timidly and subject to the desires and actions of Esso. (*Id.*) The EQB has failed to control and supervise Esso's actions according to the report. (*Id.*)

26. The commissions recommended, *inter alia,* that the law should be amended to establish more rigorous requisites to penalize those responsible for spills who fail to report the same. (Plaintiff's Exhibit VII, at 12–13.) It was also recommended that such breach should constitute a felony and that the fines imposed should be sufficiently high to dissuade any potential violator. (*Id.* at 13.) The Commission of Government integrity was prompted to identify those public officials who permit-

ted the slowness with which the gasoline spill was handled and referred them to the Department of Justice or the Office of Government Ethics to determine whether any crimes were committed or any violation of the laws and regulations of the Commonwealth of Puerto Rico occurred. (*Id.* at 14.)

### E. *Carlos Belogodere*

27. Belgodere works as a consultant for Rodríguez, the operator of the station. (Tr. at 80.) Previously, in the 1980's, Belgodere worked for Esso also as a consultant. (*Id.* at 81.) His services ended by reason of incompetence. (*Id.*)

28. Even though he is not a party to the proceedings at issue here, Belgodere has attended some of the sessions and public hearings on the order to show cause. (*Id.* at 81–82.) He has been observed approaching EQB's counsel table, passing notes, whispering and conversing with Norman Velázquez during breaks. (*Id.* at 82–83.) Among other things, Belgodere assisted in the drafting of the order to show cause and has admitted to having promoted the Senate investigation. (*See* Plaintiff's Exhibit IX.)

29. Belgodere has shown a violent animus toward Esso and even toward EQB officials. (Tr. at 86–89.) He has threatened people with physical violence and has suggested that through means of extortion, this case can go away.

30. Rosana María Roig is a public relations professional who is president of her own public relations firm. (*Id.* at 132.) Her services were retained by Esso in June, 2001 to campaign at La Vega ward and to organize community efforts. (*Id.* at 132–33.) Roig testified that as part of her obligations, she went to La Vega in order to learn about the community. (*Id.* at 133.) She visited the house next door to the station and met with the owner of the house, Doña Carmen. (*Id.* at 134.) Roig was told by Doña Carmen that everything had to be dealt with through Belgodere because he was in charge of the community. (*Id.*)

31. About July, 2001, Belgodere called Roig's office and agreed to meet with her to talk about the community. (*Id.* at 134–35.) He stated that he was the community's representative. When they met, Belgodere strongly told Roig that he was the only representative of the community and that no one was allowed to contact the community unless they talked strictly with him. (*Id.* at 135.)

32. At the meeting with Roig, Belgodere threatened Esso and particularly her family. (*Id.* at 135–36.) He indicated that he had newspaper connections and that he controlled everything. (*Id.* at 136.) He also stated that he knew Roig's company had not filed some tax returns and that he could tell a reporter or write an article. (*Id.*) In addition he told Roig that he knew she had children. (*Id.*)

33. Belgodere also told Roig that if nothing was done about La Vega community, he would find out where the children of Jorge Concha, an Esso executive, went to school and would have them know that her father was a killer of children. (*Id.* at 137.) At some point, Belgodere implied that he had many contacts at the EQB and that the case could be settled if Esso paid $6,000,000 to the community and $2,000,000 to Rodríguez. (*See* Plaintiff's Exhibit XVIII.) He claims to be able to make the proposed fine disappear or get much lower. (Tr. at 137.) He suggested that he knew of an EQB official that was selling permits and that with such knowledge, he could control the process, by way of blackmail. (*Id.* at 137–38.)

34. Roig had an opportunity to attend several administrative hearings at the EQB. She was surprised to see Belgodere sitting at counsel table with EQB lawyers as if he was part of the team, advising

them, passing notes and mocking Esso lawyers. (*Id.* at 140–41.)

## V. DISCUSSION

A seminal question presented for decision in this case is whether the ongoing administrative proceedings at the EQB offend the Due Process Clause of the United States Constitution by subjecting Esso to the apparent or even actual bias in the adjudicative process. Esso moves for this court's intervention, specifically seeking a declaration that the administrative process, at least as applied to it, is unconstitutional and moving to enjoin the proceedings. The defendants argue, however, that the remedy sought by Esso cannot be provided. According to the defendants, principles of comity and exhaustion of state remedies bar injunctive relief to paralyze an ongoing state administrative proceeding that has not concluded. Tersely, the defendants contend that the relief requested by Esso is beyond this court's authority to provide since *Younger v. Harris* dictates abstention under these facts.

■ I start with familiar principles. When a party is seeking to enjoin state judicial or quasi-judicial proceedings, principles of federalism and comity are implicated. In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Court outlined a rule of abstention that among other things, seeks "to achieve a proper balance between sensitive federal and state interests." *Brooks v. N.H. Supreme Court*, 80 F.3d 633, 637 (1st Cir. 1996) (citing *Younger v. Harris*, 401 U.S. at 44, 91 S.Ct. 746). Thus, *Younger* ordinarily precludes a federal court from adjudicating the merits of a federal claim when doing so "would needlessly inject federal courts into ongoing state criminal prosecutions." *Id.* The doctrine has, however, evolved to include within its ambit other types of state proceedings such as civil actions and administrative adjudications. *Id.; see also Maymó–Meléndez v. Álva-*

*rez–Ramírez*, 364 F.3d 27, 31 (1st Cir. 2004) (observing that "the *Younger* doctrine has been extended to 'coercive' civil cases involving the state and to comparable state administrative proceedings that are quasi-judicial in character and implicate important state interests"). Indeed, the application of *Younger* is not a matter exclusive to criminal prosecutions anymore. *See, e.g., New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 367–68, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (stating that federalism and comity concerns have led to the extension of the *Younger* protection beyond criminal prosecutions); *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 623–27, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (applying abstention under *Younger* to state administrative proceedings based on sex discrimination); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–35, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (applying *Younger* abstention to state attorney disciplinary proceedings); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 603–05, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (applying *Younger* to a civil action initiated by the state to enforce a nuisance statute).

■ In *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. at 432, 102 S.Ct. 2515, the Court established that the analytical framework under which *Younger* abstention must be analyzed is comprised of three factors. *See Brooks v. N.H. Supreme Court*, 80 F.3d at 638. Federal courts must abstain from reaching the merits of a case over which it has jurisdiction if an ongoing state judicial proceeding: (1) was instituted prior to the federal proceeding; (2) implicates an important state interest; and (3) provides an adequate opportunity for the plaintiff to raise the claims advanced in the federal lawsuit. *Middlesex County Ethics*

*Comm. v. Garden State Bar Ass'n*, 457 U.S. at 432, 102 S.Ct. 2515. In this spirit, the recently decided case of *Maymó–Meléndez v. Álvarez–Ramírez*, 364 F.3d at 34–36, relying on the Supreme Court decision in *Huffman v. Pursue, Ltd.*, 420 U.S. at 607–11, 95 S.Ct. 1200, accentuates exhaustion of available state remedies as a prerequisite for overcoming *Younger* abstention. The parties in this case have made patently clear their disagreement as to the application of *Maymó* to the facts of this case. While the defendants argue that the holding in *Maymó* controls the outcome of the present case undoubtedly mandating abstention under *Younger*, Esso maintains that the facts of this case are distinguishable from those in *Maymó*.

In *Maymó*, the Puerto Rico Horse Racing Industry and Sport Administration (hereinafter "the Administration"), which is the public instrumentality created to regulate everything connected with horse racing in Puerto Rico, brought forth charges against Maymó for allegedly improperly administering drugs to horses under his care. *Maymó–Meléndez v. Álvarez–Ramírez*, 364 F.3d at 29. The Administration sought, through the initiation of an administrative quasi-judicial proceeding, to suspend plaintiff's horse training license. *Id.* The district court granted a preliminary injunction preventing Maymó's suspension. *Id.*

On appeal, the court explained that the Administration has the power to regulate the horse racing sport in Puerto Rico. *Id.* Such power includes the ability to enforce regulations promulgated by the Racing Board. *Id.* The Board in turn had promulgated the "controlled medication program," a set of regulations governing the administration of drugs to race horses. *Id.* While the regulations prohibited some drugs outright, other drugs were allowed but only if administered in accordance with established procedures and by authorized personnel. *Id.* Two of the drugs regulated by the controlled medication program are Clenbuterol and Tramadol. *Id.* In 1999, nine horses that were trained by the plaintiff underwent post-race urine tests that came back positive for Clenbuterol. *Id.* One horse tested positive twice. *Id.* Accordingly, the Administrator filed 10 charges against the plaintiff and assigned the case to a hearing examiner. *Id.* In the midst of the proceedings, another horse trained by Maymó underwent a post-race urine test that came back positive for Tramadol. *Id.* In 2000, the hearing examiner submitted a report to the Administrator finding that in all 10 instances Maymó had administered Clenbuterol to the horses in violation of the controlled medication program. *Id.* at 29–30. The Administrator adopted the hearing examiner's conclusions over Maymó's objection and suspended his license to train for five years. *Id.* at 30. Maymó filed a petition for review with the Racing Board that ultimately affirmed the sanction, which was stayed until the review process ended. *Id.* The Puerto Rico Circuit Court of Appeals similarly affirmed the Board's decision and the suspension. *Id.*

While review of the Clenbuterol suspension was pending at the Board, the Administrator filed a new charge against Maymó for the positive Tramadol. *Id.* The case was assigned to the same hearing examiner who concluded that he had also administered Tramadol to a horse in violation of the controlled medication program. *Id.* The Administrator adopted the hearing examiner's report and sanctioned Maymó with another five-year suspension to run consecutively with the Clenbuterol suspension. *Id.* With his suspension on the Tramadol case set to begin on July 1, 2002, Maymó filed a complaint in federal court under 42 U.S.C. § 1983 alleging due process violations and bias. *Id.* Despite the federal lawsuit, plaintiff petitioned the

Racing Board for review of the Tramadol decision. *Id.* Subsequently, on July 11, 2002, the Administrator suspended Maymó's license based on the Clenbuterol case after he failed to extend the state-court stay. *Id.* at 31. Maymó filed a second complaint challenging the Clenbuterol suspension which was consolidated in the district court. *Id.* In the mean time, the Puerto Rico Circuit Court of Appeals denied Maymo's motion for reconsideration and the Puerto Rico Supreme Court denied review of the case. *Id.*

After a hearing, the district court concluded that Maymó was entitled to the injunctive relief requested and issued a preliminary injunction preventing the Administrator from suspending Maymó's license. *Id.* The defendants appealed claiming, among other things, that the court should have refrained from deciding the merits of the consolidated cases based on *Younger* abstention principles. *Id.*

The court of appeals in *Maymo* extensively discussed the reason why the district court erred in granting injunctive relief. However, the court discusses the Clenbuterol case and the Tramadol case separately. The reason appears to be one of timing. A preliminary injunction was improper in the Clenbuterol case because it came about after Maymó had completed the state judicial review of the administrative proceedings. *Id.* at 32–34. In such instance, judicial intervention was precluded by principles such as *res judicata,* the full faith and credit statute and the *Rooker–Feldman* doctrine. *Id.* at 32–33. Although nominally independent from each other, these concepts are, according to the *Maymó* court, variations of the same theme: respect and statutory compulsion of prior judgments of a state court; and the generally accepted idea in federal court that a litigant who has had an opportunity to raise issues and objections is precluded from seeking collateral review of a state judgment. *Id.* at 33. At least as to the Clenbuterol case, the plaintiff had a judicial recourse which he used without success. *Id.* As Chief Judge Boudin put it: "In [the Clenbuterol] case, the Racing Administrator and the Racing Board *may have been biased, unfair, or flat out wrong;* but the state provided a judicial remedy, Maymó invoked it, and he lost." *Id.* (emphasis added). Thus, the plaintiff, having completed the available judicial review, could not collaterally attack the Puerto Rico Circuit Court of Appeals decision affirming the Clenbuterol suspension. *Id.*

The Tramadol case presented a different issue according to the court. *Id.* at 34. Since Maymó was at the stage of appealing his suspension to the Racing Board when he brought his federal lawsuit, there was no state-court proceeding. *Id.* Maymó had filed a petition for review with the Racing Board, but the same was returned to him due to the pendency of the federal lawsuit because the Administrator determined that it would be pointless for the Board to review the suspension. *Id.* at 31. Observing that *Younger* abstention would apply to a state administrative proceeding such as the one held at the Racing Board, the court phrased the issue in the following terms:

> The question, then, is whether Maymó can avoid *Younger* abstention by failing to pursue his administrative remedy within the Racing Board. This question, although not identical, is related to the larger question whether, even if Maymó had completed review by the Racing Board, he could have refused to seek judicial review in the state court and instead brought his federal claims to federal court in an injunction action. Needless to say, this issue—essentially an exhaustion of remedies question—is a matter of general importance that could affect an array of state proceedings.

*Id.* at 34. The court answered both questions in the negative. Relying on the Supreme Court decision in *Huffman v. Pursue, Ltd.*, 420 U.S. at 607–11, 95 S.Ct. 1200, the court observed that "once a state judicial proceeding had begun, the exhaustion of state judicial remedies was required by *Younger*; despite the formal break between trial and appellate review, the Court deemed the proceeding 'ongoing' for *Younger* purposes until the state appellate process was complete." *Id.* at 34–35. The court further reasoned that exhaustion of state remedies is required by *Younger* "even though the state court decision would then likely be preclusive of any new federal lawsuit." *Id.* at 35. The court held that *Younger* has to be read as treating a state process, where like here the administrative proceeding is judicial in nature, as a continuum from start to finish. *Id.* According to the court, there are exceptions to *Younger*; but absent any such applicable exception, "there cannot at any point on the continuum be an automatic right to detour into federal court because unhappy with an initial answer." *Id.*

■ There can be no doubt that the proceedings at the EQB on the order to show cause are judicial in nature, are on going and involve an important state interest in environmental protection. Thus, the specific question becomes whether *Younger* mandates that this court abstain from entertaining the merits of Esso's request for a preliminary injunction in light of available state remedies. Esso has moved to enjoin the proceedings at the EQB contending that being subjected to the process in itself offends due process. Esso maintains that the EQB is not an impartial adjudicator in a process in which it could be the subject of a $76,000,000 fine. The exorbitance of the proposed fine is, according to Esso, the best example of the bias and prejudgment of the case by the EQB. A number of additional claims of structural and actual bias and prejudice are advance by Esso in its attempt to counter defendants' *Younger* argument.

Like *Maymó*, the resolution of the issue in this case turns on timing. The problem with Esso's position—despite its claim that the EQB has already prejudged and decided the case as if it is a done deal—is that the administrative quasi-judicial process has not concluded and no fine has been imposed. I understand, for example, that Esso has raised its constitutional objections to the process in motions for accelerated dismissal filed with the EQB and that such motion has not been ruled upon by the agency. Thus, it is unclear whether the EQB is an adequate forum to present said constitutional arguments. But since the next hearing on the order to show cause is scheduled for August 10, 2004, nothing precludes the EQB from entertaining the merits of the motion and addressing the constitutional claims. Furthermore, under Puerto Rico's Uniform Administrative Procedures Act, final orders and determinations of administrative agencies such as the EQB, may be reviewed by the Puerto Rico Circuit Court of Appeals provided that procedural requirements are satisfied. 3 P.R. Laws. Ann. § 2171–72. A party adversely affected by a decision of the Circuit Court of Appeals may request review, by way of writ of certiorari, to the Puerto Rico Supreme Court. 3 P.R. Laws Ann. § 2177. According to *Maymó*, that is all that is required. Like in *Maymó*, here it is unclear how far the EQB would entertain Esso's constitutional objections. But it is enough that the state court, here the Circuit Court of Appeals and the Supreme Court, would do so. "[I]t is sufficient . . . that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. at 629, 106 S.Ct. 2718. Unlike *Maymó*, where the sanction had already been im-

posed and the plaintiff failed to exhaust state remedies, here the administrative process has not concluded and no fine has been levied against Esso. Although Esso seems to affirm that it is just a matter of time before the $76,000,000 fine is imposed on it, it would also be premature for this court to predict that said fine will in fact be imposed. Further, it will also be premature to divine that the Circuit Court of Appeals will not remedy any wrong that the EQB decision may cause Esso. Consequently, in view of the fact that the administrative process is set to resume in August and that state remedies are available to Esso in the event of an adverse decision, the *Maymó* decision instructs that the policies set forth by *Younger* and its progeny be implemented and that the court refrain from enjoining a state administrative proceeding.

■ One issue remains: whether Esso's allegation of bias is sufficient to raise an exception to *Younger* in light of among others: *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Ward v. Village of Monroeville, Ohio,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); and *United Church of the Med. Ctr. v. Med. Ctr. Comm'n,* 689 F.2d 693, 701 (7th Cir.1982). For instance, in *Gibson,* which is the case in which Esso primarily relies, the Alabama Board of Optometry was conducting license revocation proceedings against certain optometrists. The Board members had a financial stake in the outcome of the proceedings, thus the Court held that if the district court had correctly concluded that the Board was incompetent by reason of bias to adjudicate the issues pending before it, it needed not defer to the Board under *Younger. Id.* at 577, 93

S.Ct. 1689. The Court stated that a different result was not required "simply because judicial review, de novo or otherwise, would be forthcoming at the conclusion of the administrative proceedings." *Id.*

Based on this, Esso argues that it has presented ample evidence regarding the EQB's structural and actual bias. It is claimed that the EQB has predetermined the issues before it and that as such, it is incompetent to adjudicate the merits of the order to show cause. Nevertheless, in *Maymó,* the court downplayed the relevance of *Gibson* and any bias argument, specially in the context of exhaustion of state remedies under *Younger.* The court stated that "*Gibson* was decided only two years after *Younger* began the process of contracting federal-court remedies, but it has never been formally overruled." *Maymó–Meléndez v. Álvarez–Ramírez,* 364 F.3d at 37. Once again citing *Huffman v. Pursue, Ltd.,* 420 U.S. at 611–12, 95 S.Ct. 1200, the *Maymó* court recognized that exceptions to *Younger* remained but that the Court in *Huffman* did not include bias [7] as one such exception. Rather the Court mentions state proceedings brought to harass or in bad faith or to enforce a flagrantly unconstitutional statute. Furthermore, the showing of an irreparable injury is still required for an injunction based on any such exceptions according to the *Huffman* Court. *Maymó–Meléndez v. Álvarez–Ramírez,* 364 F.3d at 37 (citing *Huffman v. Pursue, Ltd.,* 420 U.S. at 612, 95 S.Ct. 1200).

As stated above, Esso cannot make a showing of irreparable injury—one that is "great and immediate," *Younger v. Harris,* 401 U.S. at 46, 91 S.Ct. 746—at this stage

---

**7.** Although *Huffman* does not mention bias as one of the exceptions to *Younger* abstention, the opinion opens with a reference to *Gibson* reaffirming that when the injunction is sought for proceedings before a biased administrative body, *Younger* cannot be invoked to prompt dismissal on abstention grounds. *Huffman v. Pursue, Ltd.,* 420 U.S. at 594, 95 S.Ct. 1200.

of the administrative proceedings. There has not been a formal adjudication, and given the evidence presented in this case, the EQB may yet adjudicate the case fairly. In addition, Esso is not without recourse. It still can resort to the state judicial review process and vindicate any rights it understands are violated by the administrative process. It cannot be argued that the judicial forum in Puerto Rico will not provide Esso with a fair opportunity at vindicating its rights.

As in *Maymó*, the denial of relief in this case is not a comfortable outcome. The undisputed evidence presented by Esso regarding the EQB's handling of the case is sufficient to make any court sitting in equity pause. But at the same time, the controversy implicates sensitive principles of comity and federalism that cannot be avoided. Federal court interference with state proceedings is the exception rather than the rule because it disrupts the integrity of state proceedings and demonstrates a lack of respect for the State as a sovereign. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. at 369, 109 S.Ct. 2506. In the words of Justice Black writing for the majority in *Younger*,

the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as "Our Federalism," and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of "Our Federalism." The concept does not mean blind deference to "States' Rights" any more than it means central-

ization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger v. Harris*, 401 U.S. at 44, 91 S.Ct. 746. Here, on the one hand, the court is presented with the all too tempting option of exercising its jurisdiction to enjoin state proceedings that at the very least give the appearance of offending fundamental constitutional rights. On the other hand, the court must make sure to defer to the states in performing their separate functions, specially with respect to important interests such as environmental protection. At this point, Esso's rights may be at the mercy of the EQB. But an injunction may easily mean that Esso becomes untouchable, unaccountable for an environmental impact for which it may be at least partially responsible. It is difficult to decide which outcome is more troublesome.

■ Based on the foregoing, I find that *Younger* mandates abstention under the facts of this case. However, to close this discussion, it must also be noted that even without abstention, it seems doubtful that Esso would satisfy the requirements for obtaining preliminary injunctive relief. A court presented with a request for preliminary injunction must assess the following four factors:

(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as

contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d at 15. "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d at 9 (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir.1993)).

 The facts of the present case seem to tip the scales in favor of a finding that it is substantially likely that Esso will prevail in its procedural due process claim. After all, Esso has submitted sufficient evidence suggesting that the EQB, at least in what relates to the proposed fine, cannot be an impartial adjudicator. And one of the pillars of due process is exactly that; the presence of an impartial and disinterested tribunal. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980).

This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. *See Carey v. Piphus*, 435 U.S. 247, 259–262, 266–267, 98 S.Ct. 1042, 1043, 1050–1052, 1053, 1054, 55 L.Ed.2d 252, (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. *See Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti–Fascist Committee v. McGrath*, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

*Id.* "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).

As to the likelihood of success on the merits prong, the evidence submitted by Esso is not only undisputed, it is overwhelming. The appearance and the probability of actual bias cannot be ignored for it appears in different levels of the process. Examples are pecuniary interest on the part of the agency, undue legislative pressure, biased hearing examiners and general unfairness throughout the proceedings, to mention a few. The amount of the fine is in itself an indication of unfair treatment. Clearly, the EQB does not measure up to the yardstick of what an impartial adjudicator should be in accordance with Due Process.

 However, Esso's problem is not whether it is substantially likely to prevail. Its position falls short on the other requirements for a preliminary injunction. Specifically, on the question of potential for irreparable harm if the injunction is not granted. It has been held that "irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II Ltd. v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir.2004) (citing *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir.2004)). The burden is on the movant to demonstrate that the denial of prelimi-

 

nary injunctive relief is likely to cause irreparable harm and such showing must be "grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II Ltd. v. Blinds To Go, Inc.*, 370 F.3d at 162. Here, given my finding above on the issue of *Younger* abstention, it is clear that Esso cannot at this point meet its burden of demonstrating irreparable harm. Despite any bias argument, as explained above, the administrative proceeding has not concluded and no fine has been imposed. Similarly, Esso has to avail itself of the state judicial review process in accordance with the factors outlined in *Younger* and its progeny. Consequently, I cannot discern any concrete potential of irreparable harm in this case.

The final two prongs of the preliminary injunction standard must also be decided against Esso. Both are also affected by principles of comity and federalism. For instance, as to the balance of hardships, it appears that an injunction would have an adverse impact for the EQB in its role as an administrative agency of the state, since it interferes with the agency's regulatory and enforcement functions. As discussed above, *Younger* mandates due respect for said functions. Additionally, with respect to the effect of injunctive relief on the public interest, the consequences are not *de minimis*. The court's ruling could have an adverse impact on the public interest inasmuch as the agency created under Puerto Rico law to protect the environment and natural resources would be deprived of its power to remedy a substantial environmental impact at La Vega. In short, I find that Esso cannot show that it meets the requirements for the issuance of a preliminary injunction even if abstention were not warranted.

## VII. CONCLUSION

In view of the above, Esso's request for a preliminary injunction is DENIED.

SO ORDERED.